6]                   ` JANUARY TERM, 1922.                    295

State ex rel. Rodd v. Verage, 177 Wis. 295.`

STATE EX REL. RODD, Relator, vs. VERAGE, as County Clerk,
and another, Defendants.

*January 16—June 6, 1922.* ˑ

*Sheriffs: Removal by governor: Necessity for legal cause: Refusal
to honor pardon of governor: Contempt: Inherent power of
court: Nature and characteristics: Civil and criminal con-
tempt: Determination of court as to nature of proceeding:
Effect: Power of governor to pardon in contempt cases.*

1. In this state public office is regarded as a property right. *Ekern
v. McGovern,* 154 Wis. 157.

2. Sec. 4, art. VI, Const., providing that the governor may remove
any sheriff, giving him a copy of the charges and an oppor-
tunity to be heard in his defense, does not confer an arbitrary
power of removal on the governor, and such officer may only
be removed for legal cause.

3. The power of the governor to grant pardons is similar to that
exercised by the king at common law, who could not pardon
in cases of contempt where punishment was inflicted for the
purpose of securing to a suitor private rights which it was the
duty of the court to enforce.

4. When, to protect private rights, an injunction has been granted
restraining the commission of certain acts, and it appears
that one has committed the acts prohibited under circum-
stances indicating a purpose to disregard the order and con-
tinue the performance of the prohibited acts, and that such
continued conduct will injuriously affect the rights of the
party to the action, the court may as a remedial measure,
civil and not criminal in character, and for the purpose of
preventing further injury to a suitor, imprison the contem-
nor, and especially when application is made by the aggrieved
party. The dominant character of the imprisonment is reme-
dial and coercive though it may also have a punitive effect;
but secs. 2565–2569, Stats., authorize the court to inflict crim-
inal punishment.

5. The proceeding being civil in its nature is at all times under
the control of the court, and the court may release the im-
prisoned contemnor when in its judgment the exigency re-
quiring the imprisonment no longer exists.

6. Proceedings in the nature of civil contempt should be instituted
on order to show cause and entitled in the original action, or
by a writ of attachment and entitled as an original special
proceeding on behalf of the accused on relation of the plaint-
iff, as prescribed by secs. 3477–3497, Stats. Proceedings for

the punishment of a criminal contempt should be carried on from their inception as criminal prosecutions, with all the incidents of such actions, in the name of the state against the defendant.

7. One prosecuted for contempt has a right to know whether the proceeding is civil or criminal, and the court should see that the petition apprises accused of the character of the charges.

8. Where a petition for the punishment of one violating an injunction as a contempt was ambiguous on its face as to whether the proceeding was criminal or civil in its nature, the question as to the character of the proceeding was strictly a judicial question which the court had power to determine.

9. A judgment adjudging one violating an injunction guilty of contempt and sentencing him to imprisonment is a final judgment and not a mere order, and a writ of error would lie whether the proceedings were civil or criminal.

10. Where the court expressly ruled that the proceeding was civil and found that defendant's misconduct was calculated to and actually did impede and prejudice plaintiff's rights and remedies and did impede and interfere with justice, and sentenced him to imprisonment for four months (though the punishment for criminal contempt is limited to thirty days under sec. 2568, Stats.), there was a judicial determination that the proceeding was civil and not criminal, and that the nature of the imprisonment was remedial and not punitive, and, such determination not having been reviewed or reversed, was conclusive, and the governor had no power to grant a pardon.

11. As the governor was without power to pardon one imprisoned for civil contempt, the sheriff in refusing to recognize the pardon and in retaining the offender in custody was performing his legal duty, and his refusal to honor the pardon was not cause for his removal, under sec. 4, art. VI, Const.

[12. Whether the governor has the power to pardon in cases of criminal contempt discussed but not decided.]

13. The power of a court to punish for contempt is an inherent and necessary power to enforce orders and decrees, preserve order, compel the attendance of witnesses and jurors, and to enable the court to perform the functions for which it was created.

ESCHWEILER and DOERFLER, JJ., dissent.

CERTIORARI sued out of this court to review the executive proceedings resulting in the removal of the sheriff of Oneida county. *Order of removal vacated.*

For the relator there were briefs by *Bird, Okoneski &*

State ex rel. Rodd v. Verage, 177 Wis. 295.

*Puchner* of Wausau, *Goggins, Brazeau & Goggins* of Wisconsin Rapids, and *Charles F. Smith* of Rhinelander, attorneys, and *P. H. Martin* of Green Bay, of counsel; and the cause was argued orally by *Mr. Claire B. Bird, Mr. B. R. Goggins,* and *Mr. Smith.*

On behalf of the Governor there were briefs by *M. B. Olbrich,* special counsel for the State, and oral argument by *Mr. Olbrich.*

For the defendant *Asmundson* there was a brief by *Wylie & Sutherland* of Madison, and oral argument by *Fred M. Wylie.*

The following opinions were filed April 11, 1922:

OWEN, J.    On the 2d day of July, 1921, one Peter Christ was sentenced by the circuit court for Oneida county to imprisonment for four months in the county jail of that county for contempt of court, growing out of the violation by said Peter Christ of an injunctional order issued in an action pending in that court wherein the Rhinelander Paper Company was plaintiff and certain labor unions and various individuals were defendants.    The injunction was issued because of labor troubles between the Rhinelander Paper Company and its former employees, and it restrained the defendants and all persons to whom knowledge of the injunction should come, from intimidating, threatening, menacing, or offering abuse or physical violence to, the employees of the Rhinelander Paper Company or their families, and from in any manner interfering with the plaintiff in the securing of employees for the operation of its plant and business otherwise than by recommending, advising, or persuading persons by peaceful means not to enter into or continue in the employ of the plaintiff.

On the 26th day of October, 1921, the governor pardoned the said Peter Christ.    The relator, *Hans Rodd,* who was at that time sheriff of Oneida county, and who had the legal custody of said Peter Christ under and by virtue of the com-

mitment, declined to recognize the validity of the pardon and refused to release the said Peter Christ. Thereupon proceedings were instituted before the governor looking towards the removal from office of said *Hans Rodd* because of his alleged official misconduct in refusing to release said Peter Christ. As the result of such proceedings the governor executed an order removing the said *Hans Rodd* from office, and later appointed the defendant, *Charles Asmundson,* as sheriff of Oneida county, to fill the vacancy caused by the alleged removal of said *Hans Rodd.*

Thereupon the said *Hans Rodd* applied to this court for a writ of *certiorari,* addressed to the defendant *John J. Verage* in his capacity as county clerk of Oneida county, he being the legal custodian under the statute of the record of the removal proceedings before the governor, commanding him forthwith to certify the proceedings had before the governor, which writ was duly issued by this court. In compliance with the writ the county clerk has returned the certified copy of the proceedings to this court, and the question to be determined is whether the order removing the said *Hans Rodd* from the office of sheriff of Oneida county was a valid exercise of executive power, and whether said removal was lawful so as to create a vacancy in said office of sheriff.

At the outset this involves a consideration of the nature of the power reposed in the governor to remove the relator from his office as sheriff.

The power of this court to review the acts of the governor is thoroughly considered and determined in the case of *Ekern v. McGovern,* 154 Wis. 157, 142 N. W. 595. The field so thoroughly covered in that case will not again be traversed. If in the removal of the relator the governor was acting in a *quasi*-judicial capacity, this court may examine the proceedings to the extent of ascertaining whether the governor acted within his jurisdiction, and as to that the only question debated here is whether the governor is vested by the constitution with arbitrary power of removal. It is

contended on the part of defendant *Asmundson,* though not on the part of the governor, that such is the nature of the governor's constitutional power in the premises.

Sec. 4 of art. VI of the constitution provides that the governor may "remove any officer in this section mentioned, giving to such a copy of the charges against him and an opportunity of being heard in his defense." The officers mentioned in the section are sheriffs, coroners, registers of deeds, and district attorneys. It will be noted that the provision does not expressly state that the removal shall be for cause. The question raised by counsel for the defendant *Asmundson* arises very naturally and immediately upon a reading of the language thus employed. Was it the purpose of the framers of the constitution to confer arbitrary power of removal upon the governor? If not, why were the words "for cause" or similar language omitted? If so, why serve a copy of the charges upon the officer to be removed? Why give him an opportunity to be heard in his defense? The omission of the words "for cause" justifies the contention of the defendant *Asmundson,* but an inherent sense of justice compels hesitation in the matter of its adoption.

In this state a public office is regarded as a property right (*Ekern v. McGovern,* 154 Wis. 157, 142 N. W. 595), and while, without doubt, the people in adopting the constitution could have conferred the power of arbitrary removal upon the governor, our conception of the nature of the right to hold office does not permit of a ready acquiescence in the proposition that arbitrary power of removal was intended to be conferred. The constitution provides that the officers referred to shall be chosen by the qualified electors of the county. Having so provided, it does not seem likely that a provision would be inserted affording an opportunity for its complete nullification. If the provision we are considering is to be construed as conferring arbitrary power of removal upon the governor, then it is apparent that the governor may remove county officers who are distasteful

State ex rel. Rodd v. Verage, 177 Wis. 295.

to him from personal, political, or other reasons and install officers of his own choosing to discharge the official functions of these various county officers. That idea is not only obnoxious to an inherent sense of plain and fundamental justice, but it is out of harmony with the genius and spirit of our institutions and would seem to neutralize a fundamental principle of popular government which was plainly intended to be intrenched in the fundamental law of the state.

That popular opinion approves of an arbitrary power of removal under some circumstances is conceded, as in the case of a head of a department who is held responsible for what is done by that department. But no such relation exists between the governor and the county officers. It is true that the governor is charged with the duty of enforcing the laws throughout the state, and that the sheriffs are at his command for that purpose. But the duties of the sheriff are quite definitely defined by law, and a small portion of his functions depends upon the commands of the governor. He is a local officer, and certainly it is the popular notion that he should be chosen by the local electors. The suggestion that the governor should have the arbitrary power of removal because he may have occasion from time to time to direct the activities of the sheriff in the matter of enforcing the laws is not persuasive to induce a construction of the constitution which could be used to greatly neutralize the right of local self-government cherished by every community, and the argument completely falls so far as it is applicable to the office of register of deeds. The nature of the power conferred upon the governor to remove the sheriff is identical with his power to remove the register of deeds. As to the latter office it is believed that no reason can be suggested for conferring an arbitrary power of removal on the governor. On the other hand, it is not only appropriate but customary to provide for the removal of public officers who are unfaithful to their official duty or guilty of mal-

feasance or misfeasance in public office upon proof of official delinquency. The power thus to remove for cause fully protects the public interest and is compatible with the usual provisions to be found with reference to elective officers so far as our observations have gone. It is not customary, and certainly it is not consistent with the theory of our government, to vest in any person the power to arbitrarily remove any elective officer.

This conclusion finds confirmation in the practical construction accorded to the constitutional provision under consideration by the legislative and executive departments of the state. At an early date the legislature carried this constitutional provision into the statutes of the state. Sec. 4 of ch. 11 of the Revised Statutes of 1849 provided that "The governor may remove from office any sheriff, coroner, register of deeds, or district attorney, giving to such officer a copy of the charges against him, and an opportunity of being heard in his defense." This was taken literally from the constitutional provision. It was carried into the Revised Statutes of 1878 and appeared therein as a part of sec. 968 until the year 1917, when the legislature revised and codified the various statutory provisions relating to vacancies and removals from office. As so revised, it now appears as part of sec. 17.09 and provides that the sheriff, coroner, register of deeds, or district attorney may be removed by the governor "for cause." The procedure to be followed by the governor in cases of removal of such county officers is provided by sec. 17.16. It is first required that the charges must be preferred by a taxpayer and resident of the county; that they must be served in the manner therein provided at least ten days prior to the hearing; and that the officer may have ten days from the time such charges are served to make answer thereto.

Now the legislature did not assume to restrict or limit the constitutional power of removal conferred upon the governor. The words "for cause" were inserted no doubt

State ex rel. Rodd v. Verage, 177 Wis. 295.

for the purpose of clarity and indicated the legislative understanding of the constitutional power in such respect. This act was approved by the then governor, which approval indicated his assent to such interpretation.   Furthermore, during the course of the proceedings here under review the governor punctiliously observed the procedure prescribed by the statute and stated upon the hearing that he was then and there acting in a *quasi*-judicial capacity.   The brief filed in this court in his behalf is brought to a close in the following words:

"Conscious of the rectitude of his intentions, believing in the soundness of his position on the law, the chief executive of this state comes before the court, like any other suitor, to submit with gladness to its judgment, and with confidence expects and invites its approval of his course throughout the whole proceeding."

Thus we have the legislative interpretation of the extent of the constitutional power of removal, acquiesced in by two governors of the state.   This we think not only reflects the popular conception of the character of the power conferred upon the governor, but is in harmony with the genius of our institutions and the spirit of the fundamental principles of our government.

We have been referred to a case decided by the court of appeals of the state of New York (*Matter of Guden,* 171 N. Y. 529, 64 N. E. 451) in which that court was compelled to a different construction of a like provision of the constitution of that state by reason of the debates in the constitutional convention.   However, we do not regard that decision as binding upon us.   The record of the debates in our constitutional convention upon this question is very meager.   But such as was preserved contains no suggestion that this provision of the constitution was taken from New York.   It seems to have been discussed as a general proposition, and the inference to be drawn from such record as is preserved is that the governor should have the power to remove for cause.

Having decided that the governor was without power to remove the sheriff without legal cause, it becomes necessary now to determine whether the conduct on the part of the sheriff upon which the governor based his order of removal constituted legal cause. If the governor had power to pardon Christ, it was the undoubted legal duty of the sheriff to recognize the pardon and to release the beneficiary of the governor's clemency. On the other hand, if the governor was without power or authority in the premises, the sheriff would not be complying with the court's order of commitment, nor with his legal duty in the premises, if he recognized the governor's pardon. So we are face to face with the question whether, in view of the circumstances under which Christ was imprisoned, the power of pardon is vested by the constitution in the governor.

We enter upon our investigation mindful of the delicacy of the question involved and with a due appreciation of the fact that our views may expose us on the one hand to the imputation of timidity and irresolution, or, on the other, to that of lust for, and usurpation of, power. "But," borrowing the language of another court, "to shrink from any question legitimately before us, because of any consequences in which we ourselves may be involved, however directly, would be even more unworthy than the absolute verity of such suggestions." *Neel v. State,* 4 Eng. (Ark.) 259. We undertake our task, however, in the hope that by a reference to, and application of, well settled fundamental principles in the law we may reach a right and just conclusion.

The constitution of the state empowers the governor "to grant reprieves, commutations and pardons, after conviction, for all offenses except treason and cases of impeachment." Sec. 6, art. V. It is argued on behalf of the governor that the pardoning power thus conferred upon him is similar to the power exercised by the king of England. At common law the king exercised the power of pardon in certain, but not in all, classes of contempt cases. He could not pardon "where private justice is principally concerned in

the prosecution of offenders." Jones' Blackstone, book 4, sec. 445. "Though the king may remit the punishment due to public justice, . . . he cannot confer a favor which may deprive another of his subjects of a right." 1 Chitty, Crim. Law (5th Am. ed.) 742. In other words, the king's power to pardon did not extend to those cases where punishment in the nature of contempt was inflicted for the purpose of securing to a suitor private rights which it was the duty of the court to enforce. This is well recognized and there is no authority to the contrary. This principle logically calls for an immediate consideration of the nature of Christ's imprisonment.

The Rhinelander Paper Company filed its complaint in the circuit court setting forth that certain rights which belonged to it under the law of the land were being violated by the defendants therein named as well as by other persons, and prayed the assistance of the court in the enjoyment of those rights. The court decided that its lawful rights *were* being violated by the defendants and other persons, who were interfering in an unlawful way with the conduct of the plaintiff's business by preventing those who desired to work for the plaintiff from doing so. The court, therefore, issued its injunction restraining the defendants named in the action, as well as all others to whom knowledge of the injunction should come, from pursuing the unlawful conduct which constituted an invasion of the plaintiff's rights.

After the issuance of the injunction it was made to appear to the court that Christ and others had violated its order by doing the things which they were commanded not to do. It was thereupon made plain to the court that up to that time it had failed to secure the plaintiff in the rights which belonged to it under the law of the land. What was the court's further power in the premises? Was its authority in the matter of granting civil relief to the plaintiff at an end? Had it exhausted its power in that respect when it issued its injunction without success in the matter of se-

curing to the plaintiff the enjoyment of its rights? Had its impotency in the matter of enforcing civil rights been demonstrated? As we understand it, such is the logical effect in the ultimate of defendants' contention. They maintain that the court was powerless to do more than impose criminal punishment upon Christ for his consummated wrongful act, in which punishment no one could have a private interest, and the only relief it was within the power of the court to grant to the plaintiff was such relief as might incidentally result from an exercise of the power of the court to inflict criminal punishment; coercive or remedial punishment being impossible because of the inability of the contemnor to undo the wrong that had been done. Having established this, their further argument is that, Christ having been punished for a criminal contempt, the power of the governor to pardon sprang into existence; the result being that under such circumstances the court was powerless, except by the sufferance of the governor, to protect the plaintiff in the enjoyment of its legal rights. Such a conclusion certainly constitutes a startling revelation of the impotency of the courts to protect the individual in the enjoyment of his rights.

Justice, the enforcement of public and private rights, is the ultimate object to be secured by all government. Where justice is established peace and tranquillity follow. The judiciary is that agency of government which the people have created for the purpose of declaring and enforcing justice. As justice is the ultimate end of all government, an enlightened public opinion everywhere rebels at the thought of a weak, innocuous, and anæmic judiciary.

The people have not set up the courts as the instrumentality for declaring justice without at the same time conferring upon them ample powers to enforce private and public rights. In order to make of the judiciary a virile and efficient institution, which will secure justice to every member of society, the weak as well as the strong, the poor as well

as the rich, the humble as well as the powerful, it is necessary that courts have power to compel respect and obedience to their orders and decrees. For this purpose the power to punish for contempt, as a remedial and coercive measure, is deemed an inherent and indispensable power of the courts.

This has been proclaimed over and over again. It is a truth so obvious and fundamental that a collation of its various expressions is but sophomoric effort. Its oft-reiteration adds nothing to its soundness and is but weary cumulative evidence of its existence. As was said in *State v. Morrill*, 16 Ark. 384, at p. 390:

"Every enlightened jurist in the United States who has treated of the subject has held that the power to punish for contempts is inherent in courts of justice, springing into existence upon their creation, as a necessary incident to the exercise of the powers conferred upon them."

It is the function of the court not only to declare but to actually confer upon every individual of society, and to place him in the enjoyment of, every right which belongs to him under the law of the land. For the accomplishment of this purpose the people have placed at the command of the court the entire force of society. By virtue of the laws of the state the sheriff, who is the executive officer of the court, may call to his assistance the entire power of the county in enforcing the writs and processes of the courts. To confess the inadequacy of its civil powers, beyond executive or other interference, to secure to suitors their civil rights belonging to them under the law of the land, is to make resounding rhetoric of the constitutional declaration that "Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character."

It is freely conceded that if Christ had been commanded by the order of the court to perform some act which he had failed to perform, he might have been imprisoned by the

State ex rel. Rodd v. Verage, 177 Wis. 295.

court for the purpose of coercing him into obedience to the order of the court; and that under such circumstances the character of his imprisonment would have been beyond the ancient power of the king, or the present power of the governor, to pardon. But can it be possible that a private interest is present in the imprisonment of a contemnor for the purpose of compelling him to perform an act which a party in court is entitled to have performed, and entirely absent when the imprisonment results from his contumacious persistence in performing some affirmative act which the rights of a party litigant equally require that he shall not perform? If the court has the power to enforce the performance of an act in order to secure private rights, why does it not also have the power to prevent the performance of an act which constitutes an invasion of private rights? And when one who has been restrained by the order of the court from performing an act which constitutes an invasion of private rights deliberately performs the act restrained, why does not that indicate a design and purpose on his part not only to ignore and violate the order of the court but to continue a course of conduct in the future if he be permitted his freedom of action which will deprive a party of his rights? And if the court may imprison in the one instance to compel action, why may it not imprison in the other to restrain action?

One may be ordered by the court to sign a deed, because it is the right of a party litigant under the law of the land that he do so. Upon his failure to comply he is imprisoned. The dominant purpose of the imprisonment is to compel the performance of an act in the interest of a private party. Is the situation different, or is the power of the court to enforce civil rights less, if he be ordered to desist from conduct which constitutes a violation of private rights? To answer this question in the affirmative is to confess the impotency of courts to perform the functions for which they

were created. It is to confess their pitiful weakness in a matter in which they were supposed to be all-powerful. The answer should be obvious and unanimous.

When we consider the purpose for which courts are created, and the powers conferred upon them to enable them to discharge their functions, every member of society must pause and reflect with the utmost concern upon the suggestion that the instance may arise where a contumacious individual may scout and scoff the power of the court to compel him to observe rights which belong to another member of society. And this, we repeat, is entirely within the range of possibility if the argument in behalf of the defendants is to prevail, because if the court can, under the circumstances we are discussing, imprison the contemnor only as punishment for his public offense, for which he may be immediately pardoned by the governor, then there is not absolute power on the part of the court to protect or enforce private rights belonging to a party litigant.

Should the governor disapprove of the decision of the court and consider the relief granted to be an act of injustice he could nullify the action of the court and deprive a party litigant of the relief to which a court might hold him entitled by granting, in the form of a pardon, a license to the contemnor to disregard the order of the court. This in effect would vest in the governor a power of review of the decision not only of a trial court but of this court, and should a decision be offensive to his views of justice he could by the exercise of his power of pardon effectually deprive a party litigant of rights belonging to him under the law of the land. It should be remembered that if the governor has power to pardon Christ in this case he has power to pardon any other person who may be imprisoned for violating an injunctional order. While there may be many who think as a matter of abstract principle that the governor should have the power of pardoning one who is committed for the violation of a labor injunction, it must not be forgotten that if he be con-

State ex rel. Rodd v. Verage, 177 Wis. 295.

ceded power to ¬pardon in such cases then he may pardon in all cases where an injunctional order is violated.

If such be the authority of the governor, it would have been within his power to have defeated the decree of this court in *Attorney General v. Railroad Cos.* 35 Wis. 425, where the railroads were restrained from collecting higher rates than authorized by statute; he could have deprived the taxpayers of Fond du Lac county of their rights as declared in *Whiting v. Sheboygan & F. du L. R. Co.* 25 Wis. 167, where this court ruled that a taxpayer was entitled to an injunction restraining county officers from issuing county orders as a bonus or gratuity to certain railway companies; he could have made a "mere scrap of paper" of the decree affirmed by this court in *Apfelbacher v. State,* 167 Wis. 233, 167 N. W. 244, where the state was enjoined at the suit of a lower riparian from manipulating a dam so as to deprive the lower owner of his rightful flow of water.

These references abundantly illustrate the extent to which this power, if it exists, may be used to defeat the enforcement of private rights, and argue forcefully against the existence of such power. It is no answer to this argument to say that the governor would not abuse the power. The question is whether he has the power. If he have the power it is within the possibility of abuse, and it is the extent of the power, not the manner of its exercise, that must be considered in weighing the probability of its existence, or in deciding whether the people granted the power at all. More than this, it requires a lively imagination to conceive of circumstances under which an exercise of the power resulting in a deprivation of private rights judicially declared to exist would not constitute an abuse of the power.

As in the very nature of things the executive cannot and should not be wholly insensible to popular opinion, the existence and exercise of the power claimed would tend to the substitution of transient popular notions of right and wrong for fixed principles of law as a standard for the determina-

State ex rel. Rodd v. Verage, 177 Wis. 295.

tion of private rights. In popular government it is proper that the majority should rule. Popular opinion should dominate and control legislative acts and executive policies. Under a truly representative government the will of the people will find expression in those departments. But the sentiment which demands a response to popular thought or opinion on the part of those branches of government condemns with equal unanimity the judicial inclination to consult the weather vane which indicates the trend of popular breeze. and current. While the legislative and executive branches of government should give heed to popular opinion, it should not be forgotten that governments and constitutions are created to protect the rights of the minority; and while it is the privilege and pleasure of these departments of government to act in response to public opinion, it is not infrequently the duty of courts in protecting and enforcing the rights of the minority to brook public displeasure and criticism in the rendition of unpopular opinions. This is in accordance wth the fundamental scheme of our government. The courts stand as the buffer between the majority and the minority, protecting sacred and fundamental rights from confiscation and destruction at the hands of either. Under such circumstances the courts cannot expect, and should not court, public acclaim or approval. Their only guide and mentor should be the fundamental law and the traditions of our institutions, which should be the only standard for the determination of private rights.

But if the doctrine for which defendants contend is to prevail, it is to prevail despite and not by reason of principles obtaining at common law. By that law, punishment to compel restraint was no less private in its character than punishment to compel action. There was, of course, this difference in the result to the contemnor: where he was imprisoned to compel action he could secure his release by complying with the order of the court, but where he was imprisoned because of past executed wrongful conduct it was

beyond his power to secure his release because of the impossibility of undoing that which he had done. This situation is referred to in an article on contempt of court by Joseph H. Beale, a well recognized legal authority, to be found in 21 Harvard Law Review, p. 161, at p. 170, where it is said:

"In any case the contempt of a defendant who had violated a decree in chancery could be purged by doing the act commanded and paying costs; or, if his disobedience had been the violation of a negative injunction, he could purge himself of contempt by undoing what he had done and paying costs. In any case a waiver of the terms of the decree by the other party to the suit put an end to the imprisonment for contempt. It thus appears that imprisonment for contempt of the chancellor's decree, or rather for contempt of the king's writ issued in execution of such decree, was not punitive but coercive; and that anything in the nature of a sentence to a definite punishment, like a fine or an imprisonment for a term, was entirely foreign to the process. It sometimes happened, however, that a person violated a decree in such a way that it was impossible for him to restore the *status quo ante*. In such a case if the other party to the suit were obdurate he might remain in prison during the rest of his life, through his inability to purge himself of his contempt. This was obviously a hardship and an injustice, and a limited term of imprisonment came to be looked upon as a requirement of humanity. It was probably for this reason that in recent times a sort of punishment by limited term of imprisonment or even by fine, payable to the injured party, has been substituted for the old coercive imprisonment in case of civil contempt."

Thus we see that at common law a commitment for contempt could as well be impressed with a private interest where the imprisonment resulted from the commission of an act restrained as from the refusal to perform an act commanded. The fact that the contemnor found it more difficult to secure his release from the former than the latter imprisonment did not affect the character of the imprisonment. In either instance the dominant purpose of the im-

prisonment was the enforcement of a private right, and because the contemnor could not procure his release by undoing the wrong committed, considerations of humanity prompted the enactment of statutes limiting the term of imprisonment under such circumstances.    This no doubt accounts for the limitation of the term of imprisonment provided in ch. 150 of our Statutes.

This principle has been recognized by the federal supreme court in *Bessette v. W. B. Conkey Co.* 194 U. S. 324, at p. 329 (24 Sup. Ct. 665). Mr. Justice BREWER, in speaking of the distinction between so-called civil and criminal contempts, used this language:

"On the other hand, if in the progress of a suit a party is ordered by the court to abstain from some action which is injurious to the rights of the adverse party, and he disobeys that order, he may also be guilty of contempt, but the personal injury to the party in whose favor the court has made the order gives a remedial character to the contempt proceeding."

And in considering a similar situation in *In re Debs*, 158 U. S. 564, at p. 596 (15 Sup. Ct. 900), the same learned Justice said:

"In brief, a court, enforcing obedience to its orders by proceedings for contempt, is not executing the criminal laws of the land, but only securing to suitors the rights which it has adjudged them entitled to."

Recently a number of courts have held, in effect, that there is no such thing as private interest in punishment inflicted for a past act, and that where one is imprisoned for the violation of an injunctional order the imprisonment is purely punitive and in no sense remedial.    Defendants' contention that there can be no remedial element in punishment induced by a past act finds its most distinguished support in certain language employed by Mr. Justice LAMAR in *Gompers v. Bucks S. & R. Co.* 221 U. S. 418, 442, 443 (31 Sup. Ct. 492), where he said:

"If the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished.    Im-

prisonment cannot undo or remedy what has been done nor afford any compensation for the pecuniary injury caused by the disobedience.    If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense.    Such imprisonment operates, not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience."

And again:

"The distinction between refusing to do an act commanded,—remedied by imprisonment until the party performs the required act; and doing an act forbidden,—punished by imprisonment for a definite term, is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment."

If by this language the federal supreme court intended to declare that where one contumaciously performs an act or pursues a line of conduct in violation of a court order prohibiting the same, thereby indicating a purpose on his part to continue a course of conduct constituting a continuous violation of the rights of a suitor, his imprisonment is not and cannot be remedial, we must most emphatically disagree. But if, as seems probable in view of the prior expressions of the court already cited, the fact that the imprisonment is for a definite term, and was induced by a past violation, is merely to be considered as a test by which to determine the character of the punishment, then we assent.    It will be noted that the court refrained from saying that the circumstances afforded a conclusive test of the character of the punishment.    The language of the court is that "it generally, if not universally, affords a test by which to determine the character of the punishment."    That it was not intended to declare in the *Gompers Case* that punishment for the violation of the injunctional order could not be remedial in character may be inferred from the fact that in that case the proceedings under which Gompers was sentenced for contempt under circumstances very similar to those we are considering were held to be civil and not criminal.

So we arrive at the conclusion that where a court in order to protect private rights issues its order restraining the commission of certain acts, and it subsequently is made to appear to the court that one has committed the acts prohibited under circumstances which indicate a purpose on his part to disregard the order of the court and to continue in the performance of the acts prohibited, and that such continued conduct will injuriously affect the rights of a party to the action, the court may, as a remedial measure civil in character and for the purpose of preventing further injury to a suitor, imprison the contemnor; and especially is that so when the court is moved to action on the application of the aggrieved party. The dominant character of the imprisonment is remedial and coercive, although a punitive effect may also result. The proceeding being civil, it is at all times under the control of the court, and the court may release the imprisoned contemnor when, in its judgment, the exigency requiring the imprisonment no longer exists.

At this point it must be conceded that such a violation is a subject for punitive punishment, and secs. 2565 to 2569, inclusive, of the Statutes authorize the court to inflict criminal punishment for such a violation. If Christ was imprisoned by virtue of the power conferred upon the court by those statutory provisions his incarceration was criminal in character.

The defendants urge that the record resulting in his commitment shows that the court was acting under and pursuant to the statutory provisions just quoted. On the other hand, the relator contends that it appears from the record that the proceedings were had under and pursuant to ch. 150 of the Statutes, entitled "Proceedings to punish contempts to protect the rights of parties in civil actions."

The proceeding resulting in Christ's imprisonment was instituted by a petition entitled "State of Wisconsin, on the relation of the Rhinelander Paper Company, Plaintiff, v. Peter Christ, Defendant." It was in the form of an affi-

davit sworn to by one H. C. Hanke. It does not state what relation, if any, the said Hanke bears to the Rhinelander Paper Company, nor does it state that it is made for or on behalf of said Paper Company. It recites the issuance of the injunction, sets forth facts constituting a violation thereof by said Peter Christ, and concludes as follows: "That this application is made for the purpose of obtaining an order to show cause why said Peter Christ should not be punished as for criminal contempt." Upon this application or petition the court issued an attachment and brought the said Peter Christ before it. It also appears that a number of others were brought before the court upon similar charges at the same time. The following proceedings were then had:

The Court: As to these no answers have yet been made to this allegation of violation of the injunction. Copies have been served upon each of these, have they?

Mr. Smith (attorney for the Rhinelander Paper Co.): Yes.

The Court: You want to make answer to this as a single question or in several questions?

Mr. Lippert (attorney for defendant): We have decided a single question. Plead guilty to that charge there as to these four.

The Court: Then their answer to the allegations of the affidavit upon which these warrants are issued is that the allegations are true?

Mr. Lippert: Yes.

The Court: The clerk may enter in the minutes, each of these four defendants admits the truth of the allegations relating to the violation of the injunction in question.

The Court: I was going to inquire whether you desired to introduce any proof of any special damages, or anything of that sort.

Mr. Smith: No, we don't desire to introduce proof of any special damages to the plaintiff in this matter.

The Court: Then it turns merely upon the violation of the injunction and breach of the law.

Mr. Smith: Yes.

The court then found that the charges made against Christ were true, and that such misconduct was calculated to and actually did "defeat, impede, and prejudice the rights and remedies of the plaintiff in this action," and that his action did "defeat, impede, and interfere with justice," and with due respect to the court, and upon such finding adjudged that the defendant Peter Christ be punished, etc. Mr. Lippert, attorney for the defendant, then stated that he had considered the proceeding as one under sec. 2568 (criminal contempt statute) which limited the sentence to thirty days. He said he mentioned this only for the purpose of getting a construction. The court then ruled that the proceeding was under ch. 150 of the Statutes, relating to civil contempts.

We feel compelled to say that it does not clearly appear from the petition by which the proceedings against Christ were instituted whether they were intended to be civil or criminal. It is provided in ch. 150 that the proceedings therein mentioned shall be entitled in the original action if instituted upon an order to show cause, and if instituted upon a writ of attachment it "shall be deemed an original special proceeding on behalf of the accused on relation of the plaintiff." Proceedings in the nature of civil contempt should be instituted or entitled in one or the other manner thus prescribed. Proceedings for the punishment of criminal contempt should be "carried on from their inception as criminal prosecutions, with all the incidents of such actions, in the name of the state against the defendant." *Emerson v. Huss,* 127 Wis. 215, at p. 227 (106 N. W. 518). See, also, *Gompers v. Bucks S. & R. Co.* 221 U. S. 418, at p. 441 (31 Sup. Ct. 492).

This prompts us to remark that one who is prosecuted for contempt is entitled to know whether the proceeding is civil or criminal. This is important because of the fact that, if criminal, it may be brought to this court only upon writ of error (*State ex rel. Oshkosh T. Co. v. Goerlitz,* 172

Wis. 581, 179 N. W. 812, and cases there cited), and for the further reason that in criminal contempt cases the defendant is presumed to be innocent; he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself. *Gompers v. Bucks S. & R. Co.* 221 U. S. 418, 443, 31 Sup. Ct. 492, and cases there cited. These rights may also obtain in cases of civil contempt, although that is not so well settled. At any rate, the accused has a fundamental right to know whether he is before the court in a civil or criminal proceeding.

In this case it is apparent that the defendant did not know whether he was being prosecuted civilly or criminally until after he was sentenced, when the court announced the conclusion that the proceeding was civil in its nature. But that it was civil in character certainly does not clearly appear from the petition by which it was instituted. The prayer of the petition is that Christ be punished for criminal contempt. · An essential element of proceedings in the nature of civil contempt is that some private interest shall appear. The statute expressly provides that in order to invoke the remedies of ch. 150 it must appear that the misconduct of the contemnor must be such that "the rights or remedies of a party in an action or proceeding depending or triable in such court or before a court commissioner for the same county may be defeated, impaired, impeded, or prejudiced." The petition contained no allegation that Christ's violation of the injunctional order was attended by any such consequences, and in fact there is no allegation in the petition disclosing any interest of a private nature which the Rhinelander Paper Company had in the prosecution of Christ for contempt. On the other hand, the proceedings did not purport to be prosecuted on behalf of the state, the only party interested in a criminal prosecution. This ambiguity upon the face of the petition is most unfortunate. Trial courts should see to it that the petition by which contempt proceedings are instituted should apprise the accused of the nature

318    SUPREME COURT OF WISCONSIN. [June

State ex rel. Rodd v. Verage, 177 Wis. 295.

of the charges against him, at least as to whether they are civil or criminal in character. That character may be made plainly to appear by an observation of the above suggestions.

However, the court had Christ before it in response to a petition showing that he had violated the terms of the injunctional order. He had jurisdiction of the petition in the contempt proceedings. Granting that there was an uncertainty as to whether they were criminal or civil in nature, the court had power to determine that question. *Ekern v. McGovern,* 154 Wis. 157, 142 N. W. 595; *In re Carlson,* 176 Wis. 538, 186 N. W. 722. That was strictly a judicial question. It was not an executive question. If the accused was aggrieved by the ruling of the court he had his right of review in this court. A writ of error would lie whether the proceedings were civil or criminal in character. *Bumbalek v. Peehl,* 95 Wis. 127, 70 N. W. 71; *Baier v. Schermerhorn,* 96 Wis. 372, 71 N. W. 600. It was a final judgment, and not an order merely from which a writ of error will not lie, as in *State ex rel. Jackson v. Reid,* 174 Wis. 536, 183 N. W. 992.

It uncontrovertibly appears from the proceedings that the trial court construed them as civil in character. This not only appears from his express declaration to that effect, but it appears from his finding that the misconduct of Christ was calculated to and actually did defeat, impede, and prejudice the rights and remedies of the plaintiff in the action, and that his action did "defeat, impede, and interfere with justice." This is the dominant circumstance that gave the offense committed by Christ its civil character. That the court so construed the proceedings is further indicated by the fact that he imprisoned Christ for a period of four months, whereas criminal punishment is limited by sec. 2568 to thirty days. This amounts to a judicial determination that Christ was sentenced in civil and not in criminal proceedings and that the nature of his imprisonment is remedial and not punitive. In other words, the punishment imposed

on Christ is impressed with a private interest, and was inflicted not for the primary purpose of punishment but for the primary purpose of securing to the plaintiff its lawful rights.

It thus appears that the judiciary is the department of government established by the people for the purpose not only of declaring but of enforcing the private rights belonging to every individual under the law of the land. From time immemorial courts possessed, as inherent and necessary for the accomplishment of the purposes for which they were created, the power to punish disobedience of their orders and decrees, for the purpose of securing to private litigants their lawful rights. Even in England · punishment inflicted for this purpose was not the subject of the king's pardon. He could condone or forgive only the public offense. He could not interfere where the contemnor's conduct constituted an abridgment or invasion of the private rights of any of his subjects; that at common law, where a contemnor had performed an act which he had been restrained from performing, the punishment for the contempt was no less civil in its character than punishment inflicted to coerce the performance of an act commanded; that in this country, while punishment inflicted for a contempt growing out of the performance of a forbidden act may be criminal and may be imposed for punitive purposes merely, it may also be imposed for the purpose of securing to a party litigant his lawful rights. The statutes of this state clearly indicate that such is the legislative conception of the power of the court to punish for contempt, as they recognize that the same contempt may be punished in either civil or criminal proceedings.

The contempt committed by Christ could have been punished either criminally or civilly. While there was doubt as to whether criminal or civil proceedings were instituted against him, the court had the sole power of determining whether such proceedings were civil or criminal. It un-

mistakably construed them to be civil proceedings. This construction was binding upon all the world until reversed. The only person who possessed a sufficient interest to secure a review of that determination was Christ. He made no effort to secure a review or reversal of the determination and, consequently, it remains binding upon every one, including the governor. It being judicially determined that Christ was incarcerated in the course of civil proceedings and for the dominant purpose of protecting civil rights, a determination which it is beyond the power of the governor to disregard or set aside, and it being conceded that the power of the governor to pardon in contempt cases exists only in cases of punishment of a criminal nature, if it exists at all, it follows that he was without any power to pardon Peter Christ. Being without such power, his pretended pardon in no manner affected the duty of the sheriff, which was to detain Christ under the order of commitment. In refusing to recognize the pardon and in retaining the custody of Christ, the sheriff was but in the performance of his legal duty, and a removal based upon his refusal to honor or respect the pretended pardon constitutes a removal without cause, and it necessarily follows that the order of removal should be set aside.

This disposes of the case without reaching the question whether the governor has power to pardon in criminal contempt cases, that is, where the punishment is inflicted for purely punitive purposes and to expiate the contemnor's public offense. This is a very interesting question, and one to which we have devoted no little thought and consideration. It may be said to be an unsettled question in this country, as instances of its judicial consideration are rare. It has been held in three states that the power to pardon in such cases rests with the governor. *State ex rel. Van Orden v. Sauvinet,* 24 La. Ann. 119; *Sharp v. State,* 102 Tenn. 9, 49 S. W. 752; *Ex parte Hickey,* 4 Sm. & M. (Miss.) 751. On the other hand, the power has been denied by the supreme court

of Texas. *Taylor v. Goodrich,* 25 Tex. Civ. App. 109, 124, 40 S. W. 515. Although the question of the power of the President to pardon in criminal contempt cases was not involved, the subject was lucidly discussed in the case of *In re Nevitt,* 117 Fed. 448. The logic of the discussion resulted in a denial of the power of the President to pardon in such cases. While the question has never been before the federal supreme court, the power has been exercised from time to time by the various Presidents of the United States, pursuant to a practice evidently founded upon early opinions of attorneys general of the United States. 3 Op. U. S. Att'ys Gen. 622; 4 id. 317, 458. While we are not disposed to decide the question, as it is not necessary here, in view of the fact that it may be considered as an open question in this country we are constrained to call attention to certain phases thereof which it seems to us cannot be ignored in arriving at a sound and correct conclusion, considerations which evidently did not occur to the courts holding that the executive had the power to pardon in such cases.

As we interpret the decisions of the Mississippi, Louisiana, and Tennessee courts, they rested their conclusions upon the ground that the power of the governor to pardon was similar in its scope to that of the king of England, and that the power of the governor to pardon in contempt cases was comparable to that of the king, on the theory that the common law is in force in this country. It also seems to us that undue significance was attached to certain language used by Mr. Chief Justice MARSHALL in the case of *U. S. v. Wilson,* 7 Pet. 150, at page 160, as supporting the conclusion that the pardoning power of the king, in its full scope and extent, is under our constitutions reposed in the executive departments of government. Speaking of the pardoning power in that case, Mr. Chief Justice MARSHALL said:

"As this power had been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close

resemblance, we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it."

It is to be noted that this language was used concerning the "operation and effect" of a pardon granted in pursuance of the unquestionable power of the President of the United States. The question of the extent of the power was not involved in the case at all, and it does not seem to us that the expression there used has any bearing upon the question we are considering.

It is well to remember that while the common law of England is in force in this country, it is in force only so far as it is compatible with our views of liberty and sovereignty. In all matters touching the affairs of government and the liberty of the citizen we are apt to go astray if we proceed upon the assumption that as to such matters we are governed by the principles of the common law, for the reason that our fundamental notions of the rights of the individual, of the liberty of the citizen, and of the repository of sovereign power do not conform to the spirit in which the principles of the common law were generated and developed. This finds graphic illustration in *Nunnemacher v. State,* 129 Wis. 190, 108 N. W. 627, where this court held, in the face of universal precedent to the contrary, that the right to transfer property from the dead to the living was a natural right and not a privilege.

In this country all sovereign power is lodged in the people. They have established governments, and to these governments they have delegated such portions of the sovereign power as they have not retained unto themselves. That government is represented by three great, independent, coordinate departments—the executive, the legislature, and the judiciary. Each department is supreme in its field. Each department is independent of the others. No one of these departments may encroach upon the prerogatives of the others.

State ex rel. Rodd v. Verage, 177 Wis. 295.

It is the function of the judiciary to declare and enforce private and public rights. The power to punish for contempt is an inherent and necessary power to enforce its orders and decrees, to preserve order, to compel the attendance of witnesses and jurors, and, in general, to enable it to perform the functions for which it was created. It is not reckless statement to say that universal public opinion everywhere holds that the judiciary more than any other department of government should be immune from any outside influence or interference. Now is it possible that the people intended that the executive should possess a veto over the exercise of the power vested in the courts to punish for a contempt and disobedience of their lawful orders? Is not such a power repugnant to the entire governmental scheme of our constitution? Is it not destructive of a power of the judiciary essential to enable it to perform its functions? Does it not make of the judiciary a dependent, and not an independent, branch of government? Does it not constitute power in the governor to grant absolution to those who scout and scoff the authority of the court? That such a power would not generally be exercised by the governor may be conceded; but is not the fact that its exercise would have such effect sufficient reason for believing that the people never intended to lodge the power with the governor? Does not the power to pardon in such cases involve the power to nullify the authority of the court to enforce obedience, just as the power to tax involves the power to destroy? Does not the very purpose of the power, inherent in the courts, negative by the strongest implication the existence elsewhere of authority for its nullification? These are aspects of the question which it seems to us must receive consideration in any comprehensive or fundamental discussion of the subject.

It was quite appropriate that the king should exercise the power of pardon in such cases, because in the early history of England the king was the repository of all sovereign power. He was the government. He established his own

courts, and at times presided over them dispensing justice in person.    Jones' Blackstone, book 1, secs. 374, 375.    Formerly all writs and processes of the court were issued under the king's seal, and contempt of the king's court was therefore an affront to the king himself.    He being the repository of all sovereign power, it followed as a logical consequence that he might forgive all offenses of a public nature, including offenses to his process, his seal, his courts.    This was especially true in the early days when the king personally sat in the court, and as the fiction of the "ubiquitous presence of the king" still exists, the power to pardon offenses in the nature of contempt of court also obtains.

But here we have a different idea of sovereignty.    No one person possesses all sovereign power, and it is quite a different matter for a governor to forgive a contempt of court than for the king to exercise such prerogative.    A contempt of court is an offense against a department of government entirely distinct and separate from the executive department and just as supreme in its field as the governor is in his.    The power to punish for contempt must be regarded as a power conferred upon the courts by the people for the reason that it has from the earliest times been regarded as an essential attribute of a court.    It is the power which more than any other distinguishes a court from a mere board of arbitration.    It is a power which springs into existence coincident with the establishment of the institution.

In view of the consequences which might result from an exercise of the power to pardon those punished for criminal contempt, should such power be conceded to exist in the absence of a clear intention on the part of the people to vest it in the governor?    While the constitution vests in the governor power to grant pardons "for all offenses except treason and cases of impeachment," can it be said that contempt of court is an "offense" within the meaning of the term as there used?    While courts quite generally agree that contempt of court is in a sense a public offense, certain

it is that it is not the ordinary public offense. It has never been suggested, for instance, that one accused of contempt is entitled to a trial by jury—a constitutional right secured to the ordinary offender. Neither is one so accused entitled to a change of venue—a statutory right secured to the ordinary offender. In these respects it is to be distinguished from the ordinary offense, and, in the last analysis, it is an offense against the public only because the offensive conduct interferes with the proper function of an independent branch of government which society has erected for its own purposes. It is an offense which tends to frustrate the administration of justice and to interfere with the operation of the courts.

With the administration of justice, or the preservation of order in the court room, or the compelling of attendance of witnesses or juries, the governor has nothing to do. While the constitution enjoins the governor to "take care that the laws be faithfully executed," he is charged with no duty of punishing for contempt of court, nor of preserving order in the court room, nor compelling obedience to the orders of the court. All duty as well as all power in this respect is lodged with the court, and the court itself is responsible to the people for the manner in which it makes use of the power conferred to enable it to accomplish the purposes of its creation.

In the case of *U. S. v. Wilson*, 7 Pet. 150, at page 160, Mr. Chief Justice MARSHALL defined a pardon to be "an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed." As the governor is charged with the duty of seeing that the laws be faithfully executed, it is in strict accordance with the theory of the power of pardon that he should have power to pardon offenders against the laws which it is his duty to execute. But should such power extend to offenses with respect to which he has

no duty or concern? Does the power of one to pardon the violation of a law which it is not his duty to execute comport with the theory of the pardoning power? If the governor is not charged with the duty of enforcing obedience to the orders of the court, on what theory should he have the power to forgive disobedience of those orders? The power of the sovereign to pardon is much like the power of an individual to remit a debt. A. may remit a debt owing to him by C., but B. is without power to remit the debt which C. owes to A. In the distribution of the powers of sovereignty among three independent, co-ordinate branches of government, we cannot safely compare the extent of the power vested in either branch with the power exercised by the king. As the king was the repository of all sovereign power, his exercise of any of that power could not interfere with sovereign power lodged elsewhere.

But in this country, where government is divided into three independent branches, it is to be presumed that the people did not lodge in' one department of government a part of the sovereign power the exercise of which would nullify a part of the sovereign power lodged in another department. Such a conflict of power would not result in an orderly administration of public affairs. It would create friction between the various departments of the government which would not result in the peace or good order of society. Every learned expositor of the subject agrees that it was the purpose of the people adopting the form of government prevailing in this country to make each department of government absolutely independent, separate and distinct from the other, clothing it with full power to perform its peculiar functions and to accomplish the purposes of its creation. In view of this, the power of the governor to pardon in contempt cases, thus clothing him with power to interfere with the orderly administration of justice and the maintenance of order of courts, should be conceded with the greatest caution.

In speaking of the power of the executive to pardon legislative contempt, Story, in his work on the Constitution, vol. 2 (5th ed.) § 1503, states:

"It would seem to result from the principle on which the power of each branch of the legislature to punish for contempts is founded, that the executive authority cannot interpose between them and the offender.   The main object is to secure a purity, independence, and ability of the legislature adequate to the discharge of all of their duties.   If they can be overawed by force, or corrupted by largesses, or interrupted in their proceedings by violence, without the means of self-protection, it is obvious that they will soon be found incapable of legislating with wisdom or independence.   If the executive should possess the power of pardoning any such offender, they would be wholly dependent upon his good-will and pleasure for the exercise of their own powers. Thus, in effect, the rights of the people intrusted to them would be placed in perpetual jeopardy.   The constitution is silent in respect to the right of granting pardons in such cases, as it is in respect to the jurisdiction to punish for contempts.   The latter arises by implication; and to make it effectual, the former is excluded by implication."

Why is not this logic of Mr. Justice STORY as pertinent to the power of the governor to pardon for contempt of court as for contempt of the legislature?   Do not the reasons assigned by the learned author for denying the right of the executive to pardon the offense of legislative contempt apply with equal force to his right to pardon a contempt of court?   Is it not equally true of the latter that the "constitution is silent in respect to the right of granting pardons in such cases, as it is in respect to the jurisdiction to punish for contempts.   The latter arises by implication; and to make it effectual, the former is excluded by implication."

We recognize the question as one of the gravest importance, and one to be decided only after the most serious deliberation.   A postponement of its decision until it shall be squarely presented certainly will not jeopardize a correct determination.

The foregoing discussion has been indulged not for the purpose of embarrassing any further consideration by the court, but rather for the purpose of suggesting phases of the question which have not received judicial consideration, so far as we have been able to ascertain.    It may be that there is sufficient answer to the questions which have been raised, and if this be true, the court at such future time as they may be presented will be at liberty to give full weight and consideration thereto.    If it was the purpose of the people to lodge the power with the governor, their purpose in such respect should not be thwarted by the court.    On the other hand, if it was the purpose of the people to vest in the courts full power and authority to carry out the objects of their creation without embarrassment or interference from any quarter, the judiciary cannot with fidelity to the trust reposed in it yield the power of such interference even to a co-ordinate branch of the government.    The questions of constitutional powers are questions which the courts must determine under our theory of government; and while in a case like this considerations of deference and courtesy might incline us to yield to the contentions of a co-ordinate branch of government, nevertheless fidelity to that great trust reposed in us requires that all such questions be resolved so as to effectuate the intent of the people and to preserve the symmetry and balance of the government of their creation.

With these general remarks, submitted only for the purpose of stimulating thought and reflection upon the subject, we leave the decision of the question to a future occasion.

In closing it is proper for us to say that we are not unmindful of the popular interest hedging about this case or the public discussion which it has aroused.    This is appropriate, and augurs well for the success of democracy so long as the interest and the discussion is prompted by a desire to discover the truth.    But partisan discussion prompted not by a desire to promote the truth but rather by a dispo-

State ex rel. Rodd v. Verage, 177 Wis. 295.

sition to censure and condemn either the governor who claims the power, or the court which denied the power, does not respond to the high purposes which should animate discussions of questions of this nature.

We think from what has been said it is apparent that the question is not free from doubt, and that neither the governor should be criticised for exercising the power nor the court condemned for denying the power. In view of the decisions of three state courts conceding the power to the governor, and in view of the exercise of the power by the President of the United States, it cannot truthfully be said that the governor was attempting a usurpation of power. Neither can it truthfully be said that the court in resisting the power was prompted by an unbecoming ambition or lust for power. The governor has acted throughout the controversy with becoming dignity. The question whether the power was thus lodged in the governor could never be raised until its exercise was attempted. There are many things to indicate that it was the purpose of the governor merely to test executive power, and to test it in a way that would enable a judicial determination thereof. That it was not his purpose to frustrate the administration of justice may be inferred from the fact that the asserted power was exercised at a time when it constituted a minimum of interference with the course of justice—just a very few days before the expiration of Christ's sentence. In the presentation of the matter to this court the governor freely concedes the power of the court to determine the question, and presents in a dignified and forceful way the legal considerations which it is contended support the conclusion that the power to pardon in such cases resides with the governor. So far as we know he has most commendably refrained from any public discussion of the question while it was pending before this court. He has made no attempt to arouse public sentiment with the thought that it might influence the decision of this court. There is no indication that he started out with a

State ex rel. Rodd v. Verage, 177 Wis. 295.

view of usurping power or of forcing concession of the power, but he has rather, in a firm and dignified way, raised the question by such act on his part as would enable it to reach this court for a final determination.

We deeply regret that the conduct of the circuit judge who sentenced Christ and who denied and resisted the asserted power of the governor cannot be accorded the same generous approval. After most mature deliberation we feel it to be our duty to express our disapproval of his public discussion of the merits of the case while it was pending before this court. Such an indulgence on the part of a lawyer is condemned by the Canons of Ethics adopted by the American Bar Association, and it is to be most sincerely regretted that one who is clothed with responsibility for upholding the dignity of the judiciary should permit himself to discuss in public places and before public audiences the merits of a case pending in this court, especially when it involves consequences not wholly impersonal to himself. We are quite certain that the distinguished judge who sentenced Christ for contempt would not approve of the public discussion of the merits of a case pending before him for decision, in his presence, or where it was likely to come to his notice and attention. We think unanimous public sentiment recognizes the impropriety of a discussion of the merits of a case pending in court in the presence of a judge of that court, or under circumstances where in the ordinary course of events the substance of the discussion is likely to reach the ears of the court, and we are not only surprised but pained with knowledge of the fact that the trial judge deliberately indulged in a discussion of the merits of this case under circumstances where the discussion was more than likely to come to the attention of the judges of this court. It is only after the most mature deliberation that we feel it incumbent upon us to indulge in these painful remarks lest silence on our part may be construed as an indorsement of the propriety of the course followed by the circuit judge.

These expressions are all the more distressing because of the high esteem in which the learned trial judge is held by every member of this court. His conduct which we feel called upon to disapprove is most singularly incompatible with his distinguished judicial record and his lofty concept of judicial ethics. We cannot but feel that an intensity of conviction that the power claimed by the governor was without justification in law and disastrous in its consequences, led him into the indiscretion.

As the governor did not have the power to pardon Christ, it remained the duty of the sheriff to retain him in custody under the commitment of the court. In refusing to discharge him he was but performing his official duties, and the removal order of the governor was without legal cause therefor. The order, therefore, must be vacated, annulled, and set aside.

*By the Court.*—So ordered.


ESCHWEILER, J. (*dissenting*). I cannot agree with the majority opinion because to me it is clear:

That the proceedings were for a criminal contempt and therefore punitive solely;

That being such, they were subject to the pardoning power;

That the attempted transformation by the circuit court of the application to punish as for a criminal contempt into a proceeding for a civil contempt and the consequent enlarged punishment was unwarranted;

Due process of law having been accorded *Hans Rodd* on the charges preferred in the hearing by the executive, his determination thereon was within the field of his jurisdiction and is not subject to review or question by the judicial branch of the government.

I subscribe to the doctrine that the power to punish as for a crime, that is, by imprisonment, thereby restraining of his liberty one who violates the orders of a court or flouts its

dignity, is an inherent, common-law power of a court of justice, essential for the upholding of its authority and maintaining its dignity and self-respect. Such power is provided, limited, and defined by ch. 117, Stats., sec. 2565 et seq.

I also believe that such power cannot be taken away by the legislature from courts which are framed by the constitution, although the procedure may be, within fair limits, regulated by that body. Some courts have so exalted this common-law power in constitutional courts as to hold it beyond legislative curtailment. *Nichols v. Judge of Superior Court,* 130 Mich. 187, 193, 89 N. W. 691. A list of other cases so holding is given in *Walton L. Co. v. Kearney,* 236 Mass. 310, 316, 128 N. E. 429. In this latter case the general subject of the inherent power of courts to punish for contempt is discussed, and it is there held that an act of the legislature purporting to give the right to trial by jury in such cases is unconstitutional. Page 317. See, also, 8 A. L. R. note on p. 1544.

The legislature of this state, however, has always regulated such proceeding from as early as the revision of 1849. Such regulation, control, and narrow limitations as to fine and imprisonment has never been questioned by this court.

There is no question but that a court may imprison one who, violating its orders, thereby interferes with, impedes, defeats, or repudiates the rights or remedies of a litigant. This subject is regulated by ch. 150, Stats., sec. 3477 et seq.

These, however, are separate, distinct, and independent proceedings: one to protect the court's dignity, the other for the protection of a litigant's property rights. An individual when brought before the court to be punished as and for a contempt must be brought there by either one or the other of such proceedings, not by both or a mixture or conglomeration of both. The commitment to jail for a contempt must be either for a criminal contempt as such or a civil contempt as such, and cannot be for both in one proceeding.

State ex rel. Rodd v. Verage, 177 Wis. 295.

Though the act in question may savor of both criminal and civil contempt, that is, it may be an insult to the court and also an injury to the property rights of a litigant, nevertheless the proceeding to call him to account for such act cannot savor of both, as it was said in *Gompers v. Bucks S. & R. Co.* 221 U. S. 418, *infra,* at p. 443 (31 Sup. Ct. 492), that the incidental vindication of the court's authority in the civil and the incidental benefit to the party in the criminal "will not change imprisonment which is merely coercive and remedial, into that which is solely punitive in character, or *vice versa."*

That the essential difference between these two proceedings is such that the "two proceedings cannot be blended in one" is expressly held in the case of *In re Pierce,* 44 Wis. 411, 422, citing *State ex rel. Mann v. Brophy,* 38 Wis. 413, 425; *In re Murphey,* 39 Wis. 286; *State ex rel. Chappell v. Giles,* 10 Wis. 101, 102. It is again stated as the accepted doctrine in *State ex rel. Meggett v. O'Neill,* 104 Wis. 227, 229, 80 N. W. 447. There is nothing to the contrary of this view in *Emerson v. Huss,* 127 Wis. 215, 106 N. W. 518, relied upon by relator. That decision does, at page 225, qualify and limit certain language in the case of *In re Pierce,* 44 Wis. 411, 424, *supra,* as to the effect to be given to the word "fine" in the statute, but in no other wise is that former decision questioned, nor are the others now quoted on this point limited, much less overruled.

The distinction is clearly pointed out and defined in the · case of *Gompers v. Bucks S. & R. Co.* 221 U. S. 418, 443 *et seq.,* 31 Sup. Ct. 492, cited and quoted from in the majority opinion here. This distinction between the two forms of proceeding and that the act sought to be punished by the criminal contempt proceedings is crime in the full and true sense of the word is again emphatically pointed out in the case of *Gompers v. U. S.* 233 U. S. 604, 34 Sup. Ct. 693, an aftermath of the first *Gompers Case* just above cited, and further holding that, being thus a crime both by

334    SUPREME COURT OF WISCONSIN.    [June

State ex rel. Rodd v. Verage, 177 Wis. 295.

statute and analogy, there is a period of limitation for the prosecution of an act as being of such criminal contempt nature just as well as for its prosecution as a crime. Since the decision in the *Gompers Case* in 221 U. S. 418, 31 Sup. Ct. 492, *supra,* the holding therein made as to the distinct nature of these two proceedings has been expressly followed elsewhere. *Walton L. Co. v. Kearney,* 236 Mass. 310, 316, 128 N. E. 429, *supra; Bijur M. A. Co. v. Int. Asso. of Mach.* (N. J.) 111 Atl. 642, presenting the violation of just such an order as here, where it was held a criminal contempt and punished by fine and imprisonment. *Staley v. South Jersey Realty Co.* 83 N. J. Eq. 300, 304, 90 Atl. 1042; *Stewart v. U. S.* 236 Fed. 838; *State v. Little,* 175 N. C. 743, 94 S. E. 680; *Smith v. Smith,* 81 W. Va. 761, 95 S. E. 199. There can be, therefore, no simultaneous, cumulative, or double sentence in one proceeding.

The court having made the order of commitment for a criminal contempt loses all power thereover, and cannot stay its immediate execution, modify it, or permit its withdrawal, as seems to be held in *State ex rel. Oshkosh T. Co. v. Goerlitz,* 172 Wis. 581, 583, 179 N. W. 812. The only remedies of the contemnor are review by an appellate court, or, as said in *Ex parte Fisk,* 113 U. S. 713, 718, 5 Sup. Ct. 724, *infra,* by pardon.

When confined for civil contempt the prisoner is held under a lock with at least two keys, one carried by the prisoner, the other by the court.

The remedy to question in an appellate court the proceedings for criminal contempt is by writ of error (*In re Murphey,* 39 Wis. 286; *Williamstown v. Darge,* 71 Wis. 643, 38 N. W. 187) and not by appeal. *State ex rel. Oshkosh T. Co. v. Goerlitz,* 172 Wis. 581, 583, 179 N. W. 812.

The remedy to review the proceeding for civil contempt is by appeal. *Witter v. Lyon,* 34 Wis. 564, 575; *In re Day,*

34 Wis. 638, 642; *State ex rel. Meggett v. O'Neill,* 104 Wis. 227, 229, 80 N. W. 447; *Vilter Mfg. Co. v. Humphrey,* 132 Wis. 587, 590, 112 N. W. 1095.

If these be separate and distinct proceedings they must necessarily, as well as logically, be so from start to finish. There should be no shifting process during the migration, especially where by such shift the term of permissible imprisonment is extended.

That the petitioner, evidently acting on behalf of the Rhinelander Paper Company, which sought to have Peter Christ punished for contempt, instituted proceedings against him resulting in his imprisonment, intended to bring the same for a criminal rather than a civil contempt and that such proceedings were carried on as such until the making of the final order, seems very plain.

An order had been made by the circuit court in the suit instituted by the Rhinelander Paper Company. Sub. (3), sec. 2565, in ch. 117, Stats., providing for the acts that may be punished as criminal contempt, specifies as one of such acts the wilful disobedience of any order lawfully made by such court. The petition upon which Peter Christ was brought into court recited that "he has wilfully and contumaciously refused and still refuses to obey" such order. The prayer for the relief sought is that said Peter Christ show cause why he "should not be punished as for criminal contempt." The attachment then issued by the court recited that Peter Christ was to be brought "to make answer concerning a *certain contempt* which it is alleged he has *committed against said court in wilfully refusing to obey that certain order of said court.*" The undertaking given by him when taken into custody also recited that he was to answer for an alleged contempt of court for wilfully refusing to obey a certain injunctional order.

As recited in the majority opinion, the attorney for the Rhinelander Paper Company on the hearing of the matter,

in response to the inquiry by the court, stated that there was no desire to introduce proof of any special damages to the plaintiff.

Until this stage of the proceedings the record does not disclose anything said or done by the petitioner that suggested that the proceedings then before the court were to protect the rights of a party in a civil action. Then the findings were made by the court that the misconduct of Peter Christ was calculated to and did actually *defeat, impede,* and *prejudice* the rights and remedies of the Rhinelander Paper Company. This was the first resort, so far as the record shows, to such specific language from sec. 3477, Stats., regulating proceedings for civil contempt. No such language is found in ch. 117 regulating criminal contempt proceedings. The order directing the commitment further recited that the court found and adjudged that the "conduct of Peter Christ was in contumacious disregard and violation of the order of this court," language which is evidently appropriate for findings in proceedings for criminal contempt.

The maximum punishment permissible under the statute for criminal contempt is thirty days, as specified by sec. 2568, Stats., which has been in force in this state since the revision of 1849, appearing there as sec. 8 of ch. 87. The maximum term of imprisonment that the court could inflict, if the proceedings had been for civil contempt, is limited by sec. 3492, Stats., to not more than six months. The proceedings having been instituted as and for a criminal contempt, Peter Christ being brought into court to answer for such a criminal contempt, having entered a plea of guilty to what was evidently supposed to be such a charge, the court nevertheless proceeded to grant to the Rhinelander Paper Company more than it asked or from the nature of its proceedings had any right to expect, and to deal out to Peter Christ more than he expected, and, under the law, had the right to expect.

State ex rel. Rodd v. Verage, 177 Wis. 295.

Immediately following the preamble to the constitution of this state, wherein is expressed gratitude to Almighty God for our freedom, the very first section of the very first article of that document reads as follows:

"All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

At the time of this hearing the Rhinelander Paper Company, through the petitioner Mr. Hanke, stood before the court with its property rights involved, but asked for no relief as against Peter Christ for any impairment or injury to such property rights, and had confined itself to the matter of asking, as any third person might have asked, that one who had flouted and disregarded the order of the court should be punished as and for a criminal contempt and that only. Peter Christ stood before the court at the same time surrounded by his constitutional right, a right as old as Magna Charta, that he should not be deprived of his personal liberty except and unless by due process and under proper proceedings in law. This right surrounded him as it does every one, no matter how much such individual may ultimately deserve punishment for what he has done, just as much as did the right to protection of property rights surround the plaintiff in that action. Yet one was made superior to the other by the change then made by the court in the very essence of the proceedings before him; as substantial a change as that which this court declared in *State ex rel. Schumacher v. Markham,* 160 Wis. 431, 152 N. W. 161, the legislature could not make by the corrupt practices act in so far as it denied to one his constitutional right to a jury trial.

The apparent reason for this change and for the imposition of the more extended prison sentence appears to have

been considered by the court inflicting it and by the majority opinion here that thereby the property rights of a litigant were more efficiently safeguarded.

This is permissible, the majority say here, because though it be doubtful as a question of law whether the circuit court was correct, yet if there was judicial error it was within the jurisdiction of the court to err, and such error, if error it was, became conclusive on the world. Yet elsewhere in the majority opinion it is declared the executive, however, has no jurisdiction to err in any conclusion of his as to the nature of the proceedings over the result of which he proposes to exercise his pardoning power, but is tied fast by the prior judicial ruling, error or no error.

I fully appreciate and freely admit the possibility of error in the judicial branch of the government, but do not join in any assertion of such exclusive right to err.

I cannot agree with the grounds which underlie such result or concur in the result.

I have no sympathy with the particular individual here concerned, who deserved punishment so far as the law permitted, but whose right to have the punishment stop where the plain letter of law said that it should was as much entitled to consideration as the property rights of a litigant to protection. The possible meriting by the individual of the extended sentence should not be sufficient excuse for a wandering from the straight path of the constitution. I do not subscribe to the doctrine which must be the foundation of the holding by the majority opinion in this case, that the property rights of a litigant are superior and paramount to the right to be free from unlawful restraint of personal liberty. They should stand at least on equal footing.

Although the question is only discussed and not decided in the majority opinion, I think that, under the broad and general language as to the pardoning power placed by the constitution in the hands of the executive, a person confined for a criminal contempt may be properly released from

State ex rel. Rodd v. Verage, 177 Wis. 295.

such confinement by a pardon. 13 Corp. Jur. 97; 3 Ruling Case Law, 540; Am. & Eng. Ann. Cas. 1915D, 1062, note. In the suggestions in the majority opinion on this subject, ·*In re Nevitt,* 117 Fed. 448, is cited as impliedly holding that there is no such pardoning power in the federal executive. Yet on the other hand, in *Ex parte Fisk,* 113 U. S. 713, 718, 5 Sup. Ct. 724, such power is apparently recognized, and also in the cases of *In re Mason,* 43 Fed. 510, 515; *In re Mullee,* 7 Blatch. 23; and *Fischer v. Hayes,* 6 Fed. 63, 73. *Campion v. Gillan,* 79 Neb. 364, 112 N. W. 585, is cited and relied upon by the relator as holding the contrary. The decision in that case held that the governor has no power to pardon a prisoner found guilty of bastardy. It was then held in that case (p. 370) that a prosecution for bastardy is a civil action. That single statement makes that decision inapplicable here.' It is also held in that case that the pardon sought to be relied upon was before the conviction of the defendant and therefore not within the power of the governor under the constitution, which gives him the right to pardon "after conviction." Page 367.

The suggested fear that the judiciary will be emasculated if it recognizes the constitutional pardoning power of a co-ordinate branch of the government as extending into the field of commitments in statutory contempt proceedings does not impress me at all. It is like the myth of possible despotism arising on the ruins of our liberties if the power of removal from office is made easy, as said by the late Mr. Chief Justice WINSLOW in his dissent in the case of *Ekern v. McGovern,* 154 Wis. 157, 319, 142 N. W. 595. The inherent and much extolled power to commit for contempt.has already been pretty thoroughly fettered and tied down by legislative limitations, at least in this state. If during a hearing of a trial in a court of record a violent assault be made upon an officer of the court, a witness, or party in the case, to the manifest disturbance of the proceedings and the consequent flouting of the authority of the court, the most

State ex rel. Rodd v. Verage, 177 Wis. 295.

the court as such could do would be to confine such contemnor to the county jail for a term not exceeding thirty days. Yet if the individual be prosecuted for the same act under sec. 4377, Stats., as for an assault to do great bodily harm, he may be imprisoned in state's prison up to three years, or if under sec. 4388, Stats., for simple assault and battery, up to six months in the county jail. In either of these latter instances he might, immediately upon conviction, be pardoned.

The legislature, under its recognized constitutional authority, has defined and fixed the terms of punishment for such offenses as murder, rape, arson, burglary, and theft, all of which certainly are offenses against the rights to life, liberty and the pursuit of happiness, under which last phrase, I take it, for there is no other applicable, the right to property must come, to secure which rights our government is instituted. The constitution has delegated to the judiciary alone the function of trying such offenders charged with such offenses and adjudging the penalties. All of this is done for the protection of all the people, by all the people, through their recognized agent, the legislature. Yet the solemn ceremony of declaring an offender under any of the above mentioned or similar statutes deserving of a certain designated term of imprisonment for the protection of just such rights may nevertheless become but an idle form by reason of the unquestioned power of the executive to liberate such offender after conviction and even before the door of the prison has clanged behind him. Such substantial limitations upon the power of the judiciary both as to contempt proceedings in form and penalties as well as to offenses against the peace and dignity of the state have been acquiesced in without serious, outward at least, indications of chafing by the judiciary against such limitations and fetters. Wherein there is any more danger that the functioning of the courts is to become spineless by the recognition of the constitutionally granted power of pardoning him who sits in durance vile because a contemnor of the court than when the same kind

State ex rel. Rodd v. Verage, 177 Wis. 295.

of document frees him who is in the same confinement because a contemnor of God, man, and the peace and dignity of the state of Wisconsin, I am unable to see.

Impotence of the judiciary is not of the future only but it has often been recognized in the past. Its machinery often permits of the sending of a man to jail for an excessive term for the offense with which he is charged, and yet, after the brief period allowed for suing out a writ of error has expired, is self-confessedly powerless to let him out. *In re Carlson,* 176 Wis. 538, 186 N. W. 722. An instance where this court invited rather than repulsed the pardoning power is shown in the case of *Bruno v. State,* 165 Wis. 377, 380, 162 N. W. 167.

The power to punish for contempt, in which in a measure the magistrate sits as prosecutor, judge, and jury, while necessary and essential for a proper upholding of the power and the dignity of a court of justice, is nevertheless one to be sparingly used. Though a creation of the common law and existing from the time whereof the memory and reading of man runneth not to the contrary, yet in England, the home of the common law, it is very seldom resorted to, for as stated in *Gompers v. U. S.* 233 U. S. 604, 611, and at p. 612 (34 Sup. Ct. 693), "The English courts seem to think it wise, even when there is much seeming reason for the exercise of a summary power, to leave the punishment of this class of contempts to the regular and formal criminal process."

I shall not speak at length on other points involved except to say that I cannot agree that the legislature has the power to lessen the effect of the broad language of the constitution which grants to the governor the power to remove certain elective officers including sheriffs. I believe that the constitution itself, not legislative restricting declarations, must be resorted to in determining the governor's power. Furthermore, that the judicial branch of the government, in reviewing the action by or proceedings before an executive of the

state, can go no further than to see that the provisions of the constitution, and especially as to due process of law, are followed by or before him; that those constitutional mandates being first observed, then his determination of matters within his discretion and judgment cannot be overturned, and that such and no more was the effect of the decision in *Ekern v. McGovern,* 154 Wis. 157, 142 N. W. 595.

I think the reasoning and decision upon the similar provision in the New York constitution as to removal of elective officers as presented in *Matter of Guden,* 171 N. Y. 529, 64 N. E. 451, is applicable here and should control.

For the above reasons I think the writ should be denied.

The following opinion was filed May 16, 1922:

Doerfler, J. (*dissenting*). The writer has no thought of detracting from the able, thorough, and comprehensive majority opinion of the court; on the contrary, he realizes and appreciates the stupendous effort involved not only in the thought and study of the issues involved, but the persuasive style employed in the writing of the opinion. It is because no common ground of reconciliation can be found upon which the writer's views can conform with those of the majority, and for the reason that it is felt that the views of the entire court should be expressed on a subject of such importance, that these few lines are penned and incorporated in a dissent.

The principal issue involved herein consists in determining whether the contemnor was punished for a criminal contempt, or whether the proceeding instituted against him was remedial in its nature and resulted in the enforcement of a civil remedy by indemnity.

The court cannot, upon a conviction for contempt, punish the contemnor criminally and at the same time and in the same order award the injured party indemnity. That would constitute such a blending of a criminal action and a civil

State ex rel. Rodd v. Verage, 177 Wis. 295.

action or proceeding as is not warranted by our statutes or our code of procedure. Were that so, the contemnor would be obliged to appeal from that part of the order awarding indemnity to the injured party, and resort to a writ of error in order to review that portion of the order involving the criminal punishment. Hence, as is well said in *In re Pierce,* 44 Wis. 411, 423:

"The final order in contempt proceedings must be one thing or the other; it must impose criminal punishment for the misconduct, or enforce the civil remedy by awarding indemnity. It cannot do both."

This conclusion of the court in the *Pierce Case* has never been modified or receded from, unless the holding in *Emerson v. Huss,* 127 Wis. 215, 106 N. W. 518, can be so construed.

Great confusion has arisen in this court from a construction of ch. 117 of the Statutes, involving purely criminal contempts, and ch. 150, entitled "Proceedings to punish contempts to protect the rights of parties in civil actions." The offenses contemplated by ch. 150 involve criminal contempts in each instance, as much so as do the offenses referred to in ch. 117; the only distinction between the two sets of offenses consisting of the fact that ch. 117 refers to what are known as purely criminal contempts, viz. violations against the dignity and authority of the court, and therefore an affront against the administration of justice, while those included in ch. 150 contain all of the elements of the offenses referred to in ch. 117, are fully as serious in their nature and consequences, have a like effect upon the dignity and standing of the court, and equally interfere with the proper administration of justice; but, in addition to all of the foregoing, the contemnor has been guilty of something which is calculated to or actually does defeat, impede, or prejudice the rights or remedies of a party in an action or proceeding in a court.

The proper doctrine is laid down in 5 Crim. Law Mag. p. 174, § 22, and cited in 4 Ency. Pl. & Pr. p. 766:

"While contempt of court, in its essential character, is divided into various kinds, such as direct and constructive, civil and criminal, still, in every species of contempt, whatever may be the ultimate object of the redress sought in any individual case—*i. e.* private compensation or public vindication,—there is necessarily inherent an element of offense against the majesty of the law, savoring more or less of criminality."

The cardinal principle underlying the subject, and one which must not be lost sight of, is the fact that at common law or under the statutes of our state or the statutes of any other state, in order to punish for contempt, or to indemnify the injured party, there must first be a finding that the contemnor has been guilty of such misconduct as amounts to a contempt. *Emerson v. Huss,* 127 Wis. 215, 106 N. W. 518. It is this misconduct or contempt which is criminal in its nature.

Whether the proceedings instituted be designed under the provisions of ch. 117 or ch. 150, the basis necessarily must be a contempt. It has uniformly been held, therefore, that in order to justify an order finding the accused guilty of contempt, the proof, as in all criminal cases, must be such as to satisfy the court beyond a reasonable doubt. 4 Ency. Pl. & Pr. 768, and numerous decisions in various jurisdictions there cited.

Every presumption and intendment of innocence in a contempt proceeding is in favor of the party charged. *Weeks v. Smith,* 3 Abb. Pr. (N. Y.) 211; *Potter v. Low,* 16 How. Pr. (N. Y.) 549; *Slater v. Merritt,* 75 N. Y. 268; *Whipple v. Hutchinson,* 4 Blatchf. (U. S.) 190; *Woodruff v. North Bloomfield G. M. Co.* 45 Fed. 129.

The rule also obtains from the criminality attaching to contempt of court that the proceedings to redress the same should be strictly pursued. 4 Ency. Pl. & Pr. 770, and numerous cases cited in note.

Inasmuch as no relief can be afforded the injured party in a proceeding under ch. 150 of the Statutes unless the accused is first found guilty of contempt under the rules and practices herein referred to applicable to criminal cases, it is of little consequence to him whether, before the court makes its final order, the proceedings be considered criminal or remedial in their nature. A careful reading and study of the various sections included in ch. 150 of the Statutes has convinced the writer that the views above expressed were clearly within the contemplation of the legislature when such statutes were enacted.

It is true that sec. 3477, Stats., among other things provides:

"Every court of record . . . shall have power to punish by fine and imprisonment, or either, any neglect or violation of duty or any misconduct by which the rights or remedies of a party in an action or proceeding depending or triable in such court or before a court commissioner for the same county may be defeated, impaired, impeded or prejudiced in the following cases: . . ." (Then follow eight subsections, the various instances in which, by the portion of the section quoted, the court may punish by fine and imprisonment, or either.)

Sec. 3478, Stats., clearly contemplates a criminal contempt, even though it involves an interference with private rights. Secs. 3480 and 3481, Stats., prescribe the proceedings to be taken and followed in a contempt which involves injury to private rights. But the character of the proceedings instituted and the manner in which the proceedings shall be entitled do not obviate the necessity of first proving the contempt in every instance.

Sec. 3489, Stats., provides:

"If, upon the hearing of an order to show cause or in such proceedings in case of an attachment, the court shall adjudge the defendant to have been guilty of the misconduct alleged and that the misconduct was calculated to or actually did defeat, impede or prejudice the rights or remedies of any party in an action or proceeding pending in such court,

it shall proceed to impose a fine or to imprison him, or both, as the nature of the case shall require. A warrant of commitment must be issued accordingly."

Under the section just quoted the legislature intended a punishment for the criminal contempt, and this conclusion must be inevitably arrived at by reason of the punishment prescribed. Nothing whatever is contained in this section intended to afford relief to the injured party, but the sole purpose of the section is to provide for the punishment of the contempt in order to maintain the dignity of the court. This is made clearer by the provisions of sec. 3490, for it is there provided that:

"If an actual loss or injury has been produced to any party by the misconduct alleged the court shall order a sufficient sum to be paid by the defendant to such party to indemnify him and to satisfy his costs and expenses, instead of imposing a fine upon such defendant."

So that where there is an actual loss or injury, if the court desires to indemnify the person injured it can by its order make provision therefor; but nothing can be clearer than that if the court in granting the relief concludes to give this remedy, it cannot at the same time punish by fine and imprisonment, or either, for it would be then blending, as so aptly said in a foregoing quotation, the criminal and the civil nature of the proceeding.

Sec. 3490 also provides that:

"Where no such actual loss or injury has been produced the fine shall not exceed two hundred and fifty dollars over and above the costs and expenses of the proceedings."

This portion of the statute, in the relief given, cannot be considered criminal in its nature, for, as has been said in *In re Pierce,* 44 Wis. 411, the word as employed means indemnity, and nothing more. The indemnity awarded need not be commensurate with the actual damages, for there are many provisions in our statutes which give double and treble damages as punitory damages, and in every in-

stance where the rights and remedies of a private party have been impeded or interfered with there is a presumption of at least nominal damages. Such fine shall not exceed $250, and undoubtedly it was intended that. the amount thereof shall be fixed at a sum somewhat commensurate with the actual damages inflicted, with the limitation as aforesaid.

Sec. 3491, Stats., still further clarifies the views herein expressed, for it is therein provided:

"When the misconduct proved ·consists of an omission to perform some act or duty which is yet in the power of the defendant to perform he shall be imprisoned only until he shall have performed such act or duty and paid such fine as shall be imposed and the costs and expenses of the proceedings."

So that where the misconduct consist of an omission to perform an act or duty which the defendant can still perform, the legislature intended by the provisions of sec. 3491 · to imprison him only until he performs the act and pays the costs and expenses and until he pays the fine referred to therein, which fine is in the nature ·of a forfeiture or of a punishment, as is provided in numerous other instances by various statutes where double and treble damages are awarded.

The writer cannot agree with what is said in *Emerson v. Huss*, 127 Wis. 215, 106 N. W. 518, that the fine under a proceeding for remedial relief shall be paid to the state treasurer for the benefit of the school fund. It would stamp it as a criminal proceeding, and under such holding the civil and the criminal proceeding would be so blended as to involve both an appeal and a writ of error in the same case.

Sec. 3492 provides:

"In every other case, when no special provision is otherwise made by law, the defendant may be imprisoned for a reasonable time, not exceeding six months, and until the fine, if any, and the expenses of the proceedings are paid; and the duration of such imprisonment shall be expressed in the order and warrant ·of commitment."

In view of the foregoing statutes, a proper construction of the section last cited conveys the thought that where a fine is imposed and the defendant is ordered to pay the expenses of the proceedings and he fails to comply with such order, he may be imprisoned for a period not to exceed six months, such imprisonment to cease upon compliance, and in any event the duration of the imprisonment must be expressed; for while the facts and circumstances in one case may warrant a limitation of six months, in other cases they may require a shorter period.

Where the proceedings are designed for remedial purposes solely, and the defendant is adjudged in contempt and a proper fine or indemnity is provided for, the defendant may be committed for coercive reasons, such commitment, however, not being in the nature of a criminal punishment; and in all such cases the defendant has the key in his own possession by the use of which he can relieve himself from imprisonment.

The views above conveyed are fully and aptly contained and set forth in what is perhaps the most important and celebrated case of contempt in the history of our jurisprudence. In *Gompers v. Bucks S. & R. Co.* 221 U. S. 418, 441–443, 31 Sup. Ct. 492, it is held:

"It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial as well as punitive, and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do.

State ex rel. Rodd v. Verage, 177 Wis. 295.

The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order.

"For example: If a defendant should refuse to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance required by a decree for specific performance, he could be committed until he complied with the order. Unless there were special elements of contumacy, the refusal to pay or to comply with the order is treated as being rather in resistance to the opposite party than in contempt of the court. The order for imprisonment in this class of cases, therefore, is not to vindicate the authority of the law, but is remedial, and is intended to coerce the defendant to do the thing required by the order for the benefit of the complainant. If imprisoned, as aptly said *In re Nevitt,* 54 C. C. A. 622, 117 Fed. 451, 'he carries the keys of his prison in his own pocket.' He can end the sentence and discharge himself at any moment by doing what he had previously refused to do.

"On the other hand, if the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. *Imprisonment cannot undo or remedy what has been done, nor afford any compensation for the pecuniary injury caused by the disobedience.* If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. Such imprisonment operates not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience.

"It is true that either form of imprisonment has also an incidental effect. For if the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority. *On the other hand, if the proceeding is for criminal contempt and the imprisonment is solely punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent a repetition of the disobedience. But such indirect consequences will not change imprisonment which is merely coercive and remedial, into that which is solely punitive in character, or vice versa.*"

This decision is a crystallization of the judicial wisdom of the ages by the highest court of the greatest country in the

State ex rel. Rodd v. Verage, 177 Wis. 295.

world, and the writer considers it not only good law but un-answerable. No vested property rights or interests have resulted from any judicial holding upon the subject of con-tempt, and we are therefore at liberty to adopt the reasoning in the *Gompers Case,* above cited.

Whatever may have been the title of the proceeding in the instant case, the complainant demanded in his affidavit pun-ishment of the defendant for criminal contempt. This is persuasive but not conclusive. When the crucial period arrives, the defendant having necessarily been surrounded by the highest protection involved in a criminal case, it is for the court to say what the punishment shall be; whether it shall be of a remedial nature, or whether it shall be in the nature of a criminal punishment. It is the punishment in-flicted that determines whether it is criminal or not.

And, in conclusion upon this subject, the writer will re-peat what is said in *In re Pierce,* 44 Wis. 411, 423:

"Hence, the final order in contempt proceedings must be one or the other; it must impose criminal punishment for the misconduct, or enforce the civil remedy by awarding indemnity. It cannot do both."

The writer will not extensively discuss the subject of pardon as applicable to convictions for criminal contempt. Uniformly, with perhaps one exception, the highest courts in this country and in England have held in favor of the pardoning power. It is admitted that the right to punish for contempt is inherent in the courts; that it is necessary to maintain their dignity and standing and to properly enable them to administer justice. While in England the pardoning power rests with the King, so in this country it rests with the President and with the governors of the states. Such power was so vested in the President by the federal constitu-tion, and in the governors by the state constitutions. It is no more reflection upon the courts to recognize the pardon-ing power in the governor in a case of a criminal contempt than to recognize such power where the criminal laws of

the people enacted by the legislature have been violated and
the defendant is sentenced to imprisonment by the court.
The right to punish for contempt, while an inherent right
in the courts, is not superior to the rights of the people, for
all power, in the last analysis, is granted by and comes from
the people.    Even in monarchical governments with arbi-
trary powers the pardoning power rests with the king, the
emperor, or a provincial governor.    Such was the case even
in Russia and in Germany prior to the downfall of their
imperial governments.    Such power involves the element of
forgiveness and of mercy.    All criminal laws are designed
for the protection of the people, and where a situation arises
where a pardon or forgiveness of an offense is contemplated
to produce the public welfare, such pardon ought to be
granted.

The power expressed in a pardon is the most sacred and
godlike exercised by man in his capacity of dispensing
justice on earth.

> "The quality of mercy is not strain'd;
> It droppeth as the gentle rain from heaven
> Upon the place beneath; it is twice blest:
> It blesseth him that gives, and him that takes;
> 'Tis mightiest in the mightiest; it becomes
> The throned monarch better than his crown;
>
> .    .    .    .    .    .    .    .    .    .
> It is an attribute to God himself;
> And earthly power doth then show likest God's
> When mercy seasons justice."

This power has been vested in the highest representative
of the people in the state of Wisconsin, who is answerable
to his constituents every two years.    Such power has not
been abused in the history of this state.    Courts must shine
not by reason of any arbitrary power vested in them, but by
their inherent desire to do justice between man and man.

This pardoning power is designed to relieve the innocent,
the weak, and those who have repented of their wrong-
doings, and those who, from an honest conviction in the

State ex rel. Rodd v. Verage, 177 Wis. 295.

righteousness of their position, have taken an attitude based on what they deem a correct principle.

It is intimated in the majority opinion that where a defendant is imprisoned in a contempt proceeding such as in the instant case, he can find relief by repentance and by asking forgiveness of the judge who sentenced him.  No man who assumes a position righteously based on principle will ever be guilty of playing the part of a hypocrite.  It was the great Luther who, when confronted with the charge of heresy, said, "Here I stand."  He was willing to die for principle.

Judges are human beings, and, despite their good intentions, may be actuated by motives of resentment and may make the cause of the court their own.  Relief from such a situation is dispensed by the exercise of the pardoning power by the executive.

For the reasons above stated the writer respectfully dissents from the majority opinion in this case.

CROWNHART, J., took no part.

A motion for a rehearing was denied, without costs, on June 6, 1922.

The following was filed May 17, 1922:

PER CURIAM.    Since the filing of the opinion in this case the Hon. A. H. REID, the trial judge who committed Christ for contempt, has addressed a communication to the members of this court which is as follows:

"Wausau, Wisconsin, May 1, 1922.
"*To the Honorable the Chief Justice and the Associate Justices of the Supreme Court of the State of Wisconsin:*
"I, A. H. REID, believe that the portion of the opinion in *State ex rel. Rodd v. Verage* which does not deal with the merits of that controversy does me a serious injustice.  Fol-

State ex rel. Rodd v. Verage, 177 Wis. 295.

lowing the precedent set by former Chief Justice Dixon in *Wight v. Rindskopf,* 43 Wis. 344, 368, I submit this statement for your consideration.

"Your opinion implies that I permitted myself 'to discuss in public places and before public audiences' the merits of this case, and that I 'deliberately indulged in a discussion of the merits of this case under circumstances where the discussion was more than likely to come to the attention' of your Honors while the case was still pending.

"I am in most hearty accord, as I think must be every one entitled to the respect of the courts, the bar, or the community, in disapproving public discussion of a pending case under circumstances appearing to be calculated to influence the court either directly, or indirectly through public opinion. If the portion of the opinion referred to is to remain a part of the record, I ask in justice to myself that this statement of the facts may also be part of the record.

"I have never at any time publicly discussed this case except as hereinafter stated. There was a most vital principle at stake, and I deemed it my official duty to enforce on the sheriff who held my order his duty to obey me, notwithstanding any executive pardon, and I did so. The controversy received much newspaper notoriety in which I took no part.

"In January I was invited to be the guest of the Rock County Bar Association at their annual banquet and there give an address. I accepted and prepared such an address on the subject 'Impediments to Justice,' to be delivered March 6th. In that address I referred to the question raised in the *Rodd Case* just as I referred to other pertinent questions of public interest. I had no idea or expectation that the proceedings at that banquet of lawyers would be reported in the public press nor that any of your Honors would be present.

"On observing some of your Honors present, I asked those accessible to me at the table whether I should omit from my prepared address (a pretty difficult thing to do and preserve the continuity) the references to the *Rodd Case.* I was advised to deliver the address just as written. I followed this advice, but, when coming to the portions referring to that case, stated that the paper which I had now prepared contained some references to that case and that I

was embarrassed by the presence of some of your Honors, but deemed it best to proceed.

"If this conduct merits the prominence and condemnation which the opinion gives it, then I must accept the censure, but in fairness to myself I ask that this statement be ordered printed with the opinion so as to present the entire facts on which censure is based.

"Respectfully submitted, A. H. REID."

It is ordered that the request be granted, and that this order be published with and as a part of the official report.