# Patterson *v.* Wyoming Valley District Council, Appellant.

*Contempt of court—Evidence—Witness—Criminal liability—Constitutional law—Equity—Strikes.*

Where a contempt of court complained of consists merely in the refusal to do or refrain from doing some act commanded or prohibited for the benefit, primarily at least, of a party litigant, proceedings to ascertain such contempt and enforce obedience to the order or decree, are akin to execution process and civil rather than criminal in their nature.

Where a labor organization and its members have been enjoined from committing certain acts in the nature of a "boycott," and the decree of the court has been disobeyed, officers of the organization may, in contempt proceedings, be compelled to produce the records and minute books of the organization. Such a proceeding is not a "criminal case" or criminal prosecution within the meaning of the federal and state constitutions.

*Contempt of court—Sentence—Labor organization.*

The individual members of an unincorporated labor organization, who have been active in its management, may be punished for a contempt of court committed by the organization.

Argued Jan. 9, 1906. Appeal, No. 38, Jan. T., 1905, by defendant, from decree of C. P. Luzerne Co., Dec. T., 1901, No. 2, sentencing for contempt of court in case of J. E. Patterson & Co. v. Wyoming Valley Council et al. Before RICE, P. J.,

PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEA-
VER, JJ.   Affirmed.

Rule for an attachment for contempt of court.   Before FER-
RIS, J.
The opinion of the Superior Court states the case.

*Errors assigned* were (1) order for production of books; (2)
the decree making absolute rule for attachment and (3) the
sentence of the court.

*T. R. Martin,* and *J. L. Lenehan,* for appellant.—We con-
tend that the right of the defendants to refuse to handle the
material or lumber of J. E. Patterson & Co., or any other per-
son is an established right, and it was so ruled affirmatively
by the honorable court below, and so recognized and decided by
our Supreme Court in the case of Erdman v. Mitchell, 207
Pa. 79.
     There is no wrong in the refusal of the members of a union to
have any dealings with an employer or with any person deal-
ing with him, so long as strikers employ no other means to
deter persons from dealing with an employer than persuasion
and the withdrawal of their own patronage : Bohn Mfg. Co. v.
Hollis, 54 Minn. 223 (55 N. W. Repr. 1119); Longshore
Printing Co. v. Howell, 26 Oregon, 527 (38 Pac. Repr. 547);
Com. v. Sheriff, 15 Phila. 393; Cote v. Murphy, 159 Pa. 420;
Rex v. Seward, 1 Ad. & E. 706; Carew v. Rutherford, 106
Mass. 1.
     The court erred in obliging the defendants to produce books
and papers : State v. Knight, 3 So. Dakota, 509 (54 N. W.
Repr. 412).

*J. B. Woodward,* of *Darling & Woodward,* for appellee.—
Where a corporation is ordered to refrain from doing a particular
thing, every member of the corporation may be held in con-
tempt: Davis v. New York, 8 N. Y. Superior Ct. 451; U. S.
v. Debs, 64 Fed. Repr. 724; Thompson v. Penna. R. R. Co.,
48 N. J. Eq. 105 (21 Atl. Repr. 182); Erdman v. Mitchell,
207 Pa. 79.

OPINION BY HEAD, J., May 14, 1906 :

On October 10, 1901, the present plaintiffs filed a bill in the court of common pleas of Luzerne county alleging they were being injured in their business by reason of a " boycott " instituted and maintained by the present appellants and others, as a result of which workmen were prevented from working on any buildings to which any material was furnished by the plaintiffs, who conducted a planing mill and dealt generally in lumber and builders' supplies. An answer was filed and the case went on practically to final hearing, after which, on April 7, 1902, a decree was entered continuing the injunction indefinitely. This was regarded by the parties as in effect a final decree putting an end to the controversy. As no appeal was ever taken from this decree there is no occasion for us to consider or discuss the important principles on which the learned court below founded its judgment. They were most exhaustively summed up and ably presented in the opinions filed before and with the final decree.

On November 17, 1904, the plaintiffs filed their petition, accompanied with affidavits, representing that, in violation of the injunctive decree previously entered, the injurious interference with their business was being continued, specifying particular instances, etc. A rule was thereupon granted to show cause why an attachment, as for contempt, should not issue ; an answer was filed, testimony was taken, and on September 18, 1905, the rule was made absolute, the attachment issued and on September 22, 1905, the court imposed the sentence from which this appeal is taken. While testimony was being taken on the rule certain officers of the Wyoming Valley district council and subordinate locals were subpœnaed to produce their records and minute books showing what action, if any, had been taken concerning the business of the plaintiffs. Acting under advice of counsel they refused to produce these records before the commissioner who was taking the testimony, and on November 5, 1904, the court filed an order requiring the production of the records. This is the first error assigned in the present appeal.

The argument advanced to convict the learned court below of error in this respect is drawn from article V. of the amendments to the constitution of the United States, which provides

that no person "shall be compelled in any criminal case to be a witness against himself;" and sec. 9 of art. I. of the constitution of Pennsylvania which provides that "in all criminal prosecutions the accused cannot be compelled to give evidence against himself." These provisions having been imbedded in the fundamental law to safeguard the individual rights and liberties of the citizen must be construed with reasonable liberality so as to accomplish the object intended. But it is equally clear that their construction should not be so strained as to compel their application to cases not clearly and fairly within the letter or intendment of the language quoted. Now it must be apparent at a glance that the immunity from testifying is conferred, not in all cases, nor even in all cases where it may be in some way to the detriment of the witness to be compelled to give evidence; but only in such cases as are fairly embraced in the expressions "in any criminal case," "in all criminal prosecutions." In any ordinary or commonly accepted understanding of the meaning of these expressions, an investigation begun in a court of equity to determine whether its decree, entered in a purely civil suit between private parties, had been obeyed or violated, could hardly be classed as either "a criminal case," or "a criminal prosecution." But our courts, in their solicitude to secure to the citizen, the full measure of his constitutional rights, have not been content to rest their judgments upon any such consideration; but have sought for the nature and essential character of the proceeding in question and from a study of these have determined whether, in substance, it was civil or criminal. Thus it has been held that in an action to recover penalties inflicted by a statute the defendant can neither be compelled to testify against himself, nor to produce his books to be used as evidence against him: Boyle v. Smithman, 146 Pa. 255. So the Act of June 11, 1879, P. L. 129, enabling a plaintiff in an execution, upon filing an affidavit of his belief that the defendant was fraudulently concealing property, etc., to examine the defendant on oath as to said property, was held to be a violation of the constitutional provision now under consideration: Horstman v. Kaufman, 97 Pa. 147. In these and many other cases that could be cited the court determined that the proceeding, in its nature, was criminal and thus drew the witness within the sheltering mantle of the constitution.

What, then, was the essential character of the proceeding in the court below where the immunity from testifying and producing records claimed by certain witnesses was denied them? As we have already seen it was simply an inquiry by a court of equity to determine whether its own decree, made in a strictly civil case, had been obeyed or contemptuously violated by the party against whom it had been entered.

Proceedings to ascertain and punish contempts are as ancient as the courts which conduct them. It has been well said that " the power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge : " Watson v. Williams, 36 Miss. 331, cited in In re Debs, 158 U. S. 564 (15 Sup. Ct. Repr. 900). But from the earliest days of our legal history contempts of court and proceedings to ascertain them have been divided into two broad and easily distinguishable classes. Where the alleged contemptuous act is aimed directly at the power or dignity of the court, or subversive of the due administration of public law ; and where the responsive act of the court is purely punitive in character, to vindicate the rights of the people at large vested in their properly constituted legal tribunals, such contempts, and the proceedings to ascertain and punish them, have always been regarded as essentially criminal—as distinguished from civil—in their character. But where the act complained of consists merely in the refusal to do or refrain from doing some act commanded or prohibited for the benefit, primarily at least, of a party litigant, proceedings to ascertain such contempts and enforce obedience to the order or decree, have ever been deemed akin to execution process and civil, rather than criminal, in their nature. "Indeed the attachment for most of this species of contempts, and especially for nonpayment of costs and nonperformance of awards, is to be looked upon rather as a civil execution for the benefit of the injured party, though carried on in the shape of a criminal process for a contempt of the authority of the court. And therefore it hath been held that such contempts, and the process thereon, being properly the civil remedy of individuals for a private injury, are not released or affected by the general act of pardon : " Black. Comm. bk. IV, p. 285. The same distinc-

tion has been drawn by the courts of last resort of many of our states, but a quotation from one will be sufficient to make obvious the point now under consideration. In Thompson v. Penna. R. R. Co., 48 N. J. Eq. 105 (21 Atl. Repr. 182), the court says: "Proceedings in contempt are of two classes namely, first, those instituted solely for the purpose of vindicating the dignity and preserving the power of the court. These are criminal and punitive in their nature and are usually instituted by the court in the interest of the general public and not of any particular individual or suitor. Second, those instituted by private individuals for the purpose mainly, if not wholly, of protecting or enforcing private rights and in which the public have no special interest. These are remedial or civil in their nature rather than criminal or punitive." See also People v. O. & T. Court, 101 N. Y. 245 (N. E. Repr. 259); Dodd v. Una, 40 N. J. Eq. 672 (5 Atl. Repr. 155); Water Co. v. Strawboard Co., 75 Fed. Repr. 972.

Although we have been referred to no Pennsylvania case exactly in point there is ample authority for holding that the distinction so clearly stated by the New Jersey court, in the case quoted from, is recognized in our own state. Our act of 1842, abolishing imprisonment for debt, excepts from its operation "proceedings as for contempt to enforce civil remedies." In Chew's Appeal 44 Pa. 247, it was held that a court of equity has power to enforce a decree for the payment of money by a trustee by process of attachment against his person as for a contempt. The orphans' court has like power : Tome's Appeal, 50 Pa. 285; Com. v. Reed, 59 Pa. 425.

A careful study of all these cases leaves no room to doubt that the proceeding in the court below was a civil proceeding in essence and substance ; that under no adjudication of the terms "a criminal case" or "a criminal prosecution" could it be fairly classed as either, and, as a consequence, that no constitutional right was denied to the appellants in compelling the production of the books and records referred to in the first assignment of error which is, therefore, overruled.

The second assignment alleges error in making absolute the rule to show cause why an attachment should not issue. The argument supporting it indicates that the ruling of the court below is challenged because there was no sufficient evidence

to warrant a finding that the appellants had been, in fact, guilty of any violation of the decree previously entered. In other words, we are asked to review the action of the court in ascertaining the fact of a contempt of its own order and decree. As the power to ascertain the fact of a contempt is a necessary and integral part of the right of a court to enforce its own decrees and to punish those who willfully disregard or defiantly disobey them, it has been frequently held by courts of the highest authority that the decision of the court wherein the contempt was committed is, as to the fact of such contempt, final and not the subject of review. In re Debs, 158 U. S. 564 (15 Sup. Ct. Repr. 900), Mr. Justice BREWER, speaking for the whole court says: " But the power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court. And this is no technical rule. In order that a court may compel obedience to its orders, it must have the right to inquire whether there has been any disobedience thereof. To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency."

The same doctrine was held by Chancellor Kent in the case of Yates, 4 Johns. 317, and by the court of King's Bench in the case of Earl of Shaftsbury, 6 State Tr. 1270. In our own case of Com. v. Newton, 1 Grant's Cases, 453, WOODWARD, J., after setting forth the powers of the Supreme Court, says: " This charter of our powers cannot be so narrowed by construction as to exclude proceedings for contempt. We do not, indeed, revise such cases on their merits. The courts, having a limited jurisdiction in contempts, every fact found by them is to be taken as true, if it appears to us that they proceeded within and did not exceed their jurisdiction ; but for the purpose of seeing that their jurisdiction has not been transcended, and that their proceedings, as they appear of record, have been according to law, we possess, and are bound to exercise, a supervisory power over the courts of the commonwealth."

There being no complaint that the court below had exceeded its jurisdiction or that its proceedings, as they appear of record, have not been according to law and precedent, speaking for

myself, I would say there appears no ground for the exercise of the supervisory powers of the appellate court. But, in addition, we feel obliged to say that a careful reading of all the testimony discloses ample warrant for the finding that there was, in fact, a contemptuous violation of the injunction entered by the court below, and the second assignment is therefore dismissed.

The third and fourth assignments assail the sentence imposed by the court below upon those adjudged guilty of contempt. In form, and the character of the punishment inflicted, the sentence is in harmony with the provisions of the act of 1836 and the decisions of the Supreme Court: Com. ex rel. v. Perkins, 124 Pa. 36.

The particular error alleged in this respect seems to have been that Daniel Post and Peter Koser were ordered to stand committed until the fine imposed on the Wyoming Valley district council should be paid. It is to be remembered that this body, called the district council, was not an incorporated society. It was not a person, natural or artificial. It was but a name, adopted for their own convenience, by the individuals composing it. Each individual who became a member thereby adopted that name as a proper designation of himself acting with his fellows to carry out the object common to all.

Such a body could not be sued, eo nomine, in a common-law action: McConnell v. Apollo Sav. Bank, 146 Pa. 79.

It partakes more of the characteristics of a partnership than of a corporation. The law therefore looks behind the name and deals with the individuals who move and act under and behind such name chosen by themselves. They lose neither their identity nor their individuality by the assumption of the common name. Just as the obligations and responsibilities of a partnership become those of each individual member of the firm, so, when the moment of responsibility comes, must the individual actors of a body like this stand forth from behind the veil with which they have enveloped themselves and assume their proper shares of the common burden. It is characteristic of courts of equity that they do not usually enforce their decrees by writs of execution directed in rem as do common-law courts; but by coercing the persons of individuals who have been properly brought within their grasp. Hence particular super-

vision of the affairs of unincorporated societies has been committed to our courts of equity as best equipped to deal with such bodies: Fletcher v. Gawanese Tribe, 9 Pa. Superior Ct. 393.

The appellants, Post and Koser, were shown by the evidence to have been active and influential members of the " district council." They were present at most of the meetings of which the records were in evidence and particularly at the one where action was taken which has been found to be a violation of the decree. If they cannot be held responsible for such a contempt none of the other members can be. Thus the court will be left to fulminate against a name only while the living, breathing actors who really did the acts subversive of the decree are beyond its reach. We cannot think that a court invested with the dignity and exercising the high powers of our courts of equity is so impotent to enforce its final decrees. If it must permit such contempts to go unpunished it would soon become itself contemptible. On the whole record we are all of opinion that no substantial error has been committed by the learned court below.

Appeal dismissed at the costs of the appellants.