## Philadelphia & Reading Coal & Iron Co. v. Whary et al.

*R. P. Hicks, Samuel Gubin,* and *John H. Fertig,* for plaintiff.

*John L. Pipa* and *Daniel W. Kearney,* for defendants.

CUMMINGS, J., August 14, 1944.—In each of the two bills in equity above referred to, the court awarded a preliminary injunction against the named defendants, which, after hearing on the motion to continue or dissolve, was continued until final hearing.

Restraining orders in both cases were identical except as to the land involved and the individuals who were subject thereto.

The orders and the pertinent portions, inter alia, read as follows:

"1. That the defendants [naming them] . . . are enjoined and restrained preliminarily until hearing as follows:

"(a) From entering and trespassing upon the surface of the plaintiff's lands situate in Coal [or Zerbe] Township, Northumberland County . . . ;

"(b) From entering and trespassing upon the sub-surface or mineral estate of the plaintiff on its lands situate in Coal [or Zerbe] Township . . ."

On April 20, 1944, upon petitions alleging that the respondents therein named violated and disobeyed said preliminary injunctions, respectively, as particularly set forth in each case, the court granted a rule to show cause why respondents should not be adjudged in contempt of court and attachment issued, returnable April 24, 1944.

The violation set forth in the several petitions consisted of repeatedly entering and trespassing upon the surface and sub-surface of plaintiff's land.

On the return day of the rules, counsel for defendants and respondents in their answers claimed the right of trial by jury under the Act of June 23, 1931, P. L. 925. Whether they are entitled to such trial is now before the court.

The question for our decision, as aptly put by counsel for petitioners in their brief, is:

"To violate a preliminary injunction restraining one from entering and trespassing upon another's land, the

subject of such injunction, is one guilty of an 'indirect criminal contempt'?"

The Act of June 23, 1931, P. L. 925, sec. 1, 17 PS §2047, provides as follows:

". . . in all cases where a person shall be charged with indirect criminal contempt for violation of a restraining order or injunction issued by a court or judge or judges thereof, the accused shall enjoy . . .

"(c) Upon demand, the right to a speedy and public trial by an impartial jury of the judicial district wherein the contempt shall have been committed, provided that this requirement shall not be construed to apply to contempts committed in the presence of the court or so near thereto as to interfere directly with the administration of justice, or to apply to the misbehavior, misconduct, or disobedience of any officer of the court in respect to the writs, orders, or process of court . . ."

Defendants in these cases contend that they are entitled to a jury trial under this act. This would be true if the acts committed by them constituted an indirect criminal contempt as defined in that act. It is admitted that the acts constituting the contempts in this case were indirect, not having been committed in the presence of the court, so that the question resolves itself into a determination of the term "criminal contempt".

There are two well-recognized classes of contempt—criminal and civil. The courts have defined them on innumerable occasions. The following quotations from standard texts are excellent examples of the general principles which determine the nature of the contempt:

"6. Civil and Criminal Contempts. — Proceedings for contempt are of two classes—namely, criminal and civil. Criminal contempt proceedings are those brought to preserve the power and vindicate the dignity of the court and to punish for disobedience of its orders. Civil contempt proceedings are those instituted to preserve and enforce the rights of private parties to suits

and to compel obedience to orders and decrees made for the benefit of such parties. The former are criminal and punitive in their nature, and the government, the courts, and the people are interested in their prosecution. The latter are civil, remedial, and coercive in their nature, and the parties chiefly interested in their conduct and prosecution are those individuals for the enforcement of whose private rights and remedies the suits were instituted . . .": 12 Am. Jur. sec. 6, p. 392.

"Sec. 81. Civil and Criminal Contempts Distinguished. — Contempt proceedings are classified into civil and criminal. Those instituted solely for the purpose of vindicating the dignity, and preserving the power, of the court are criminal and punitive in their nature and are usually instituted by the court in the interest of the general public, not of any particular individual or suitor. Those instituted by private individuals for the purpose mainly, if not wholly, of protecting or enforcing private rights and in which the public has no special interest are remedial or civil in their nature, rather than criminal or punitive.

"Where the act complained of consists merely of the refusal to do or refrain from doing some act commanded or prohibited for the benefit, primarily at least, of a party litigant, proceedings to ascertain such contempt and enforce obedience to the order or decree have ever been deemed akin to execution process and are civil, rather than criminal, in their nature.

"Whether a contempt is civil or criminal, although each may overlap the other, depends upon whether the prosecution is for private or public purpose. The punishment for a civil contempt is remedial and for the benefit of the complainant, while the punishment for a criminal contempt is punitive, to vindicate the authority of the court": 1 Standard Pa. Practice, sec. 81, pp. 68, 69.

Our own Superior Court has defined criminal and civil contempts as follows:

" '(4). A criminal contempt is conduct that is directed against the dignity and authority of the court, and may occur in either criminal or civil actions and special proceedings.

" '(7). Criminal contempts, being offenses directed against the dignity and the authority of the court, are offenses against organized society, which, although they may arise in the course of private litigation, are not a part thereof, but raise an issue between the public and the accused, and are, therefore, criminal and punitive in their nature.'

"An 'indirect' criminal contempt is therefore a criminal contempt, as defined above, committed not in the presence of the court or so near as to interrupt its proceedings.

"The same distinction is recognized in 6 R. C. L. 490: 'Proceedings for contempt are of two classes—those prosecuted to preserve the power and vindicate the dignity of the courts and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made for enforcing the rights and administering the remedies to which the court has found them to be entitled. The former are criminal and punitive in their nature, and the government, the courts, and the people are interested in their prosecution. The latter are civil, remedial and coercive in their nature, and the parties chiefly in interest as to their conduct and prosecution are the individuals whose private rights and remedies they were instituted to enforce' ": Penn Anthracite Mining Co. v. Anthracite Miners of Pa. et al., 114 Pa. Superior Ct. 7, 12, 13.

In Federal Trade Commission v. McLean & Son et al., 94 F.(2d) 802 (C. C. A. 7, 1938), footnote page 804, the following principles were stated:

"The courts of the United States recognize that the process of contempt has two distinct aspects—one criminal, to punish disobedience; and the other remedial and civil to enforce a decree of the court, and to compensate private persons: Kreplik v. Couch Patents Co., 1 Cir., 190 F. 565, at page 569.

"An essential element of proceedings in the nature of civil contempt is that some private interest shall appear: State v. Verage, 177 Wis. 295, at page 317, 187 N. W. 830, 839, 23 A. L. R. 491.

"The punishment is to secure to the adverse party the right which the court has awarded to him: Bessette v. W. B. Conkey Co., 194 U. S. 324, 24 S. Ct. 665, 667, 48 L. Ed. 997.

"Substantial benefit to a private party preponderating over that to the government is the distinguishing characteristic of a civil contempt: Holloway v. Peoples Water Co., 100 Kan. 414, 167 P. 265, 268, 2 A. L. R. 161."

The difficulty, however, arises in the application of these general principles as stated by the Supreme Court of the United States in an early case on the subject:

"Contempts are neither wholly civil nor altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both': Bessette v. Conkey, 194 U. S. 329 [48 L. Ed. 1002, 24 Sup. Ct. Rep. 665]. But in either event, and whether the proceedings be civil or criminal, there must be an allegation that in contempt of court the defendant has disobeyed the order, and a prayer that he be attached and punished therefor. It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two· classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive

. . . and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison": Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 441, 55 L. Ed. 797, 806.

Dissatisfaction has been expressed with the state of the law in the field of contempts. The following language used by Judge Clark of the Third Circuit Court of Appeals of the United States is indicative:

"We cannot pretend satisfaction with the state of the authorities re the distinction between criminal and civil contempt . . .

"A former professor in the Yale Law School has poured cold water on the whole idea, saying:

" 'Few legal distinctions are emptier than that—except of procedural technicality.'

". . . and the Supreme Court of Massachusetts has described the distinction as resting 'in shadow' (Root v. MacDonald, 260 Mass. 344, 358 157, N. E. 684, 688, 54 A. L. R. 1422)": In re Eskay, 122 F.(2d) 819, 822 (C. C. A. 3d, 1941).

Because of the difficulty in determining whether a particular contempt is criminal or civil in nature, the courts have found it necessary to examine in detail the facts of each particular case in order to determine which aspect is dominant: Nye et al. v. United States et al., 313 U. S. 33, 85 L. Ed. 1172 (1941) ; Holloway v. Peoples Water Co., supra.

As stated in a recent decision of the Supreme Court of the United States:

"While particular acts do not always readily lend themselves to classification as civil or criminal contempts, a contempt is considered civil when the punishment is wholly remedial, serves only the purposes of the complainant, and is not intended as a deterrent to offenses against the public": Nye et al. v. United States, supra (p. 42), quoting McCrone v. United States, 307 U. S. 61, 64, 83 L. Ed. 1108, 1110. See also

National Labor Relations Board v. Hopwood Retinning Co., Inc., et al., 104 F. (2d) 302, 305 (C. C. A. 2d, 1939).

The courts, in considering the facts of each case, have placed reliance on a number of factors or elements which are said to indicate whether the nature of the contempt is primarily civil or criminal in character. No single factor is considered definitive or conclusive. As stated by Judge Learned Hand in In re Guzzardi, 74 F.(2d) 671 (C.C.A. 2d, 1935) (p. 672):

"The great importance attached to the characterization as criminal of a proceeding to punish for contempt, dates from Gompers v. Buck's Stove Company . . . before which the practice had been looser. The Supreme Court there set out the elements which persuaded it that that proceeding had been civil. We read the opinion, not as making crucial any one detail, but rather as summing up the features of a portrait which as a whole was plainly recognizable . . ."

In Nye et al. v. United States, supra, the elements considered indicative of the nature of the contempt are as follows: (1) Title of the action—if civil in character, it indicates that the contempt action is civil; (2) whether the public or the Government is a party to the action—if not, civil contempt is indicated; (3) whether holding the defendant in contempt affords relief to a private party—if so, the nature is civil; (4) nature of the relief requested—if primarily for the benefit of the complainant, action is civil; (5) character of the act charged—if primarily civil in character, it indicates a civil contempt; (6) is there revealed a purpose to punish for contempt "in aid of the adjudication sought in this principal suit", Lamb v. Cramer, 285 U. S. 217, 76 L. Ed. 715, 719—if so, a civil contempt is indicated.

It will be seen at once that if these standards are applied to the present case, the nature of the contempt is purely civil in character. All of the elements considered above, if applied to the present case, show that

the action is part of the original action between the parties in this case and those affected thereby. Neither the Government nor the court itself is a party to the action nor primarily interested in or injured by the acts of defendants. The relief sought by the contempt proceedings is exclusively for the benefit of plaintiff and to protect its legal rights. It is not sought to punish defendants, but to compel them to abide by the orders of the court made in these cases in favor of plaintiff, in order to protect plaintiff's property. The acts charged are primarily civil in character and not criminal. The plain purpose of the contempt proceedings is to aid in the protection of the rights already adjudicated in plaintiff's favor by this court. The entire proceedings and all of the elements thereof are clearly civil in nature and for the benefit of plaintiff. The public is in no way involved nor has it any interest in the matter. The rights affected are purely private rights and not public. The relief sought is purely private.

It has been suggested that the contempt is civil in nature where the defendant refuses to do an affirmative act required by a mandatory order and criminal where the defendant commits an act he has been commanded not to do: see Gompers v. Bucks Stove & Range Co., supra. This test has not been applied in subsequent cases and has not even been used as one of the many elements indicating the nature of the contempt (see cases cited, supra.) Obviously, this criterion has no validity. As stated in 36 Harv. L. R. 617, in a case note commenting on People ex rel. Brundage v. Peters, 137 N. E. 118 (Ill.), 26 A. L. R. 16:

"It is commonly said that the purpose of the punishment rather than the character of the act is the deciding factor. . . . Under this test it has been held that it is a civil contempt where the party refuses to do that which he is ordered to do and criminal where he does that which he is forbidden to do [citing Gom-

pers v. Bucks Stove & R. Co.]. But punishment which on its face seems purely punitive may in fact be coercive. . . . The true test should regard the nature of the act which constitutes the contempt when the act simply interferes with the enforcement of a decree. Whether affirmative or negative, it is civil contempt and the punishment is remedial; but where the act strikes at the discipline and efficiency of the judicial authority, it is criminal contempt and punishment acts penally . . . hence violation of an injunction should not be criminal contempt unless the violation is a lawless act endangering the unhampered administration of justice . . ."

This question was fully considered in State ex rel. Rodd v. Verage, 187 N. W. 830 (Wis.), 23 A. L. R. 491, 499, 501, 503 (1922). Defendant was imprisoned for contempt in violating an injunction enjoining him from intimidating, threatening, or offering abuse or physical violence to plaintiff's employes. The question involved was whether the contempt was civil or criminal. It was argued on behalf of the defendant that the contempt was criminal because the defendant had committed acts he had been ordered not to do and therefore the court could punish only for his consummated wrongful act; that coercive or remedial punishment was impossible under the circumstances because the wrong could not be undone. The court, however, refused to make this distinction, declaring (p. 499) :

"If the court has the power to enforce the performance of an act in order to secure private rights, why does it not also have the power to prevent the performance of an act which constitutes an invasion of private rights? And when one who has been restrained by the order of the court from performing an act which constitutes an invasion of private rights deliberately performs the act restrained, why does not that indicate a design and purpose on his part, not only to ignore and violate the order of court, but to continue a course of

conduct in the future, if he be permitted his freedom of action, whch will deprive a party of his rights? And if the court may imprison in the one instance to compel action, why may it not imprison in the other to restrain action?

". . . Thus we see that at common law a commitment for contempt could as well be impressed with a private interest, where the imprisonment resulted from the commission of an act restrained, as from the refusal to perform an act commanded . . . In either instance the dominant purpose of the imprisonment was the enforcement of a private right. . . .

"This principle has been recognized by the Federal Supreme Court in Bessette v. W. B. Conkey Co., 194 U. S. 324 . . . Mr. Justice Brewer, in speaking of the distinction between so-called civil and criminal contempts, used this language:

" 'On the other hand, if in the progress of a suit a party is ordered by the court to abstain from some action which is injurious to the rights of the adverse party, and he disobeys that order, he may also be guilty of contempt, but the personal injury to the party in whose favor the court has made the order gives a remedial character to the contempt proceedings.' See also In re Debs, 158 U. S. 564, at page 596."

This court further noted the language used in Gompers v. Bucks Stove & Range Co., supra, and says (1) that the language was not necessary to the decision in this case, and (2) that it did not believe the Supreme Court intended to make such a distinction. A careful reading of the decision in the Gompers case will reveal that, despite the language used, the fact was that the court held the defendant guilty of a civil contempt even though the acts which he committed were in violation of an injunction negative in character commanding him to refrain from making certain publications. The only point made in the Gompers case is that the punishment for this type of contempt should be remedial in

nature (as for example by a compensatory fine), rather than purely punitive (as by a definite term of imprisonment). It definitely does not hold that contempts for violations of injunctions cannot be civil where the defendant commits an act he has been commanded not to do. The court, in State ex rel. Rodd v. Verage, supra, further declared (p. 503):

"So we arrive at the conclusion that where a court, in order to protect private rights, issues its order restraining the commission of certain acts, and it subsequently is made to appear to the court that one has committed the acts prohibited under circumstances which indicate a purpose on his part to disregard the order of the court, and to continue in the performance of the acts prohibited, and that such continued conduct will injuriously affect the rights of a party to the action, the court may as a remedial measure, civil in character, and for the purpose of preventing further injury to a suitor, imprison the contemner; and especially is that so when the court is moved to action on the application of the aggrieved party. The dominant character of the imprisonment is remedial and coercive, although a punitive effect may also result. The proceeding being civil, it is at all times under the control of the court . . ."

See also to the same effect People ex rel. Brundage v. Peters, 137 N. E. 118 (Ill.), 26 A. L. R. 16, Root et al. v. MacDonald et al., 260 Mass. 344, 157 N. E. 684, 54 A. L. R. 1422, Bessette v. Conkey, 194 U. S. 324, 48 L. Ed. 997, Patterson v. Wyoming Valley District Council, 31 Pa. Superior Ct. 112, 1 Pennsylvania Standard Practice, sec. 81, pp. 68, 69.

It will be noted that in the case of Patterson v. Wyoming Valley District Council, supra, our Superior Court did not distinguish between negative and positive orders in determining whether a contempt was civil or criminal. At page 116, the court declared:

"But from the earliest days of our legal history contempts of court and proceedings to ascertain them have been divided into two broad and easily distinguishable classes. Where the alleged contemptuous act is aimed directly at the power or dignity of the court, or subversive of the due administration of public law; and where the responsive act of the court is purely punitive in character, to vindicate the rights of the people at large vested in their properly constituted legal tribunals, such contempts, and the proceedings to ascertain and punish them, have always been regarded as essentially criminal — as distinguished from civil — in their character. But where the act complained of consists merely in the refusal to do or refrain from doing some act commanded or prohibited for the benefit, primarily at least, of a party litigant, proceedings to ascertain such contempts and enforce obedience to the order or decree, have ever been deemed akin to execution process and civil, rather than criminal, in their nature." See also Leman, Admr., et al. v. Krentler-Arnold Hinge Last Co., 284 U. S. 448, 76 L. Ed. 389.

The appellate courts of Pennsylvania have had occasion to consider the provisions of the Act of 1931 in but three instances. The first case arose in 1934. Defendant members of a labor union were enjoined from interfering with plaintiff's mining operation by menaces, threats, and violence. Later, proceedings in contempt were instituted against the defendants and others charging them "with sundry violations of the injunction by preventing and attempting to prevent the employes of plaintiff petitioning company from going to work, and committing assaults upon the employes and officers of plaintiff company, and threatening said employes with bodily harm, and that appellants, with many others, gathered about the entrance to the colliery of the plaintiff company for the purpose of picketing and preventing the employes of plaintiff company from going to and from their work, so as to prevent them

from carrying on their occupation; that by their acts defendants have contemptuously defied the order of the court and the acts of peace officials attempting to preserve order": Penn Anthracite Mining Co. v. Anthracite Miners of Pennsylvania, supra (p. 11).

Defendants demanded a jury trial under the Act of 1931, cited supra. The lower court held this act unconstitutional and adjudged defendants guilty of contempt. On appeal to the Superior Court, the decision of the lower court was reversed. It was held that the act was constitutional, there being no unconstitutional legislative interference with the inherent contempt powers of courts of equity.

The court defined "criminal contempt" as follows (pp. 12-13) : [supra, pp. 87-89].

In relating these principles to the facts of the case, the court stated (p. 18) :

"Under the pleadings it is admitted that the acts charged against appellants were not committed in the presence of the court or so near thereto as to obstruct the administration of justice. It is admitted that they were committed at least ten miles away from the court room. The allegations of the petition for the rule, show that the acts set forth therein constitute a criminal offense; the acts show assault and battery, the crime of riot and inciting to riot, and aiding and abetting in the commission of a crime or crimes. In addition, the evidence on behalf of petitioner show acts which are criminal under the laws of Pennsylvania. In the case at bar, the proceedings were instituted by a private party for the purpose of vindicating the dignity and power of the court. The court below found that appellants had committed 'contemptuous violation of an order of this court', and imposed a fine to stand committed until the order be complied with."

On appeal to the Supreme Court of Pennsylvania, the decision of the Superior Court was sustained: Penn

Anthracite Mining Co. v. Anthracite Miners of Pennsylvania et al., 31 Pa. 401 (1935).

With respect to the definition of a criminal contempt, the Supreme Court had only the following to say (p. 404) :

"It is not disputed that the acts alleged to have constituted the contempt of court occurred ten miles from the courthouse and were, therefore, an indirect contempt; it is likewise undisputed that indictments would lie for the various crimes involved in the acts said to have been committed. The appeal does not, therefore, require us to determine the general scope of the term 'indirect criminal contempt' as used in the statute."

The third case in which the provisions of the Act of 1931 were considered by our appellate courts was Kegg et al. v. Bianco et al., 151 Pa. Superior Ct. 234 (1943). Here, defendants were enjoined "from coercing, intimidating or otherwise hindering the officers or members of said local [union] in the conduct and management . . ." of its affairs. One of the plaintiffs filed a petition asking that one of the defendants be adjudged in contempt of court for viciously assaulting, seriously injuring and threatening to kill the petitioner. Defendant demanded a jury trial under the Act of 1931.

With respect to the acts constituting the contempt in this case, the following was stated (pp. 236-237) :

"It is likewise clear that since an indictment would lie for the crime involved in the acts said to have been committed the contempt was criminal. See Penn Anthracite Case, 318 Pa. at page 404."

We find, then, that in both the Penn Anthracite case and the last-cited case the acts of defendants were clearly criminal in nature to the extent that they constituted serious indictable criminal offenses under the law of Pennsylvania and normally triable by a jury. In both cases, the conduct of the defendants was clearly "directed against the dignity and authority of the Court", raised "an issue between the public and the

accused", and were "offenses against organized society". The proceedings for contempt were clearly punitive in nature and not primarily for the benefit of the plaintiff or to preserve or enforce plaintiff's rights. It is to be particularly noted that in each of these decisions the point is made that the contempts were clearly criminal in nature since they constituted indictable offenses under the law of Pennsylvania. It is further to be noted that in the Penn Anthracite case, in which the Act of 1931 was held constitutional, both the Superior and Supreme Courts relied heavily on the decision of the Supreme Court of the United States in Michaelson et al. v. United States ex rel., 266 U. S. 42, 69, L. Ed. 162, 35 A. L. R. 451, which held constitutional similar Federal legislation known as the Clayton Act of October 15, 1914, 38 Stat. at L. 738, 28 U. S. C. §381 et seq. This act afforded the right of jury trial to any person who, in disobeying any order, decree, etc., of a district court of the United States, also committed a criminal offense under any statute of the United States or under the law of any State in which the act was committed. The Pennsylvania Act of 1931 is similar, differing only in that it does not define "criminal contempt" specifically, as does the Federal act.

The Supreme Court in the Michaelson case stated that the Clayton Act did not abrogate or "render practically inoperative" the inherent power of the courts to punish for contempt. It merely regulated that power within certain limits. The court there further declared (p. 66):

"The statute now under review [Clayton Act] is of the latter character. It is of narrow scope, dealing with the single class where the act or thing constituting the contempt is also a crime in the ordinary sense. It does not interfere with the power to deal summarily with contempts committed in the presence of the court or so near thereto as to obstruct the administration of justice, and is in express terms carefully limited to the

cases of contempt specifically defined. Neither do we think it purports to reach cases of failure or refusal to comply affirmatively with a decree—that is to do something which a decree commands—which may be enforced by coercive means or remedied by purely compensatory relief. If the reach of the statute had extended to the cases which are excluded a different and more serious question would arise. But the simple question presented is, whether Congress may require a trial by jury upon the demand of the accused in an independent proceeding at law for a criminal contempt which is also a crime."

It is significant that the Supreme Court in this case was careful to confine the effect of the provision for jury trial in the Clayton Act to narrow limits. The same reasoning is applicable to the like provision of the Act of 1931 under consideration.

It is also significant to examine the intent and purpose of the field of legislation typified by the Clayton Act and the Pennsylvania Act of 1931. This will clearly reveal that this legislation was intended to preserve the right of trial by jury in those classes of contempts, particularly in labor disputes, where acts were committed which constituted substantive crimes.

The following appears in an exhaustive article on the subject of contempts in 37 Harvard L. R. 1010, 1055, cited with approval by Justice Maxey in the Penn Anthracite case, supra:

"These 'and all other cases of contempt not specifically embraced within section twenty-one of this Act', were to be punished in conformity with the prevailing usages 'at law and in equity'. In other words 'direct contempts' were not touched at all and were left to be dealt with by the courts in summary fashion. The Act did not even deal with all 'indirect' or 'constructive' contempts. From these it carved out a limited class which had been peculiarly productive of persistent and growing concern. The House Committee on the Ju-

diciary thus explained the considerations which demanded attention and the care with which they were met:

" 'The Bill is an evolution from prolonged and varied discussion, by no means limited to á recent date or to the present Congress. Every feature and provision of it has been subjected to attack and defense, but the whole controversy appears to have at length converged upon the issue whether or not the policy and practice of jury trial in contempt cases shall be admitted in the Federal jurisprudence at all.

" 'That complaints have been made and irritation has arisen out of the trial of persons charged with contempt in the Federal courts is a matter of general and common knowledge. The charge most commonly made is that the courts, under the equity power, have invaded the criminal domain, and under the guise of trials for contempt, have really convicted persons of substantive crimes for which, if indicted, they would have had a constitutional right to be tried by jury. It has been the purpose of your Committee in this Bill to meet this complaint, believing it to be a sound public policy so to adjust the processes of the courts as to disarm any legitimate criticism; and your Committee confidently believes that so far from weakening the power and effectiveness of Federal courts, this Bill will remove a cause of just complaint and promote that popular affection and respect which is in the last resolve the true support of every form of governmental activity' ": Landis & Frankfurter, Power of Congress Over Procedure in Criminal Contempts, 37 Harvard L. R. 1010, 1054, 1055.

And in Taliaferro v. United States, 290 Fed. 906, 910 (C. C. A. 4th, 1923), the following was said regarding this legislation:

"What it [Congress] had in mind was plain enough. In the course of a strike some one may be assaulted, or some property may be willfully injured or destroyed.

If an injunction has been issued, such acts are usually breaches of it, and they, of course, are always criminal offenses. There had been much complaint that a jury trial, to which an accused was entitled if the thing charged against him was a crime, would be denied him if it was called a contempt. Congress felt that substantial rights should not depend upon what appeared to many to be nothing but a play upon words."

The Act of 1931 under consideration must be considered against this background. It is plain that the provision for jury trial must be confined to the narrow limits indicated, keeping in mind the purpose and intent of this type of legislation. Our Supreme and Superior Courts evidently had this in mind when, in the three cases decided under this act, stress was laid on the fact that the acts done by the defendants for which they were being charged with contempt also constituted indictable criminal offenses. It is even doubtful whether any act which violated an injunction and also constituted an indictable crime, would automatically fix the character of the contempt as criminal: see Marcus et al. v. Pennsylvania Trust Company of Pittsburgh, 23 F.(2d) 303, 305 (C. C. A. 3, 1927). Our appellate courts have clearly indicated that a contempt in an injunction case is to be classified as criminal and so entitle the defendant to a trial by jury only where the act complained of constitutes of itself an indictable criminal offense.

In the case at bar, no such act is complained of in the petition to attach for contempt. It is complained only that defendants have violated the injunction of this court by continuing to trespass upon plaintiff's land. No other issue is raised. There is no charge that defendants have committed any acts which constitute an indictable crime. Trespassing upon land primarily involves civil rights, rather than criminal. Even in its most criminal aspect, under the laws of this State, it constitutes only a minor offense punishable sum-

marily and carrying a maximum penalty of a $10 fine or imprisonment of 10 days in default of payment of the fine: The Penal Code of June 24, 1939, P. L. 872, as amended by the Act of May 21, 1943, P. L. 306, sec. 1, 18 PS §4954. It does not constitute an indictable offense. Defendants would normally have no right to trial by jury. How, then, can it be reasonably argued that under these circumstances they are now entitled to a jury trial? As shown above, the legislation in question was intended to prevent conviction of substantive crimes without the benefit of a trial by jury under the guise of exercising contempt powers of the courts. This case lacks this element. Since defendants would not normally be entitled to a trial by jury, they cannot utilize this act as an excuse for gaining one and thus defeat its very purpose.

The issues in this case are defined by the pleadings. No charge is contained in the petition for attachment for contempt other than defendants have continued to trespass upon plaintiff's land in violation of the injunction. No acts are complained of which constitute indictable criminal acts on the part of the respondents. That this was controlling was held in Patton v. United States ex rel. South Side Co., 288 Fed. 812 (C. C. A. 4, 1923). There defendants were enjoined from inducing or inciting plaintiff's employes to break their contract of employment with plaintiff. Two of the defendants were cited for contempt in attempting to induce some of plaintiff's employes to break their contract of employment. The lower court refused defendants a jury trial and found them guilty of contempt. Defendants contended they were entitled to a jury trial under the Clayton Act, since the bill of particulars which set forth the alleged contempt also charged acts which constituted a criminal offense under the laws of West Virginia (where the acts occurred). It was held that this was not true. The statute in question made it a crime to attempt to prevent persons from working by use of "force, threats, menaces or intimidation",

whereas the bill of particulars merely charged the defendants with attempting to prevent persons from working. The court said (p. 814) :

"The bill of particulars does not charge force, threats, menaces, or intimidation, which are essential to sustain a criminal charge under the state statute. It follows that nothing is charged which would be an offense under the criminal statute, and therefore the appellants were not entitled to a jury trial."

The chancellor is of the opinion that under the general principles and rules announced by the courts relative to criminal and civil contempts, the facts in the present case place the contempt under consideration in the civil category. There is no element of interest to the general public, nor of offense to the public welfare. Only the plaintiff is interested in a purely private capacity. Only the plaintiff suffers any injury or damage from defendants' violative acts, and only it will suffer injury or damage if these acts are permitted to continue. The sole purpose of the contempt proceedings is remedial to protect plaintiff's legal rights which have been preliminarily adjudicated by this court. The proceeding is not instituted for the purpose of punishing defendants for past wrongs which cannot be undone, but is for the purpose of preventing defendants from continuing to violate the injunction to the prejudice of plaintiff's property rights. Plaintiff seeks only to enforce obedience to the court's preliminary decrees. There is in these proceedings no element of vindication of the authority, dignity, or power of the court. Furthermore, there has been no public disturbance or breach of the peace in connection with the acts of defendants violating the injunction, nor are they charged with having committed an act which would constitute an indictable offense under the laws of this State. They have been charged with no act, the conviction of which would normally be within the exclusive province of a jury.

The chancellor, therefore, holds that the contempts in question are purely civil in character and not criminal, and defendants are not entitled to a jury trial under the Act of 1931 to determine whether the injunction granted in this case has been violated.

### Order

And now, to wit, August 14, 1944, the demand for a jury trial in both cases, nos. 760 and 761 of 1944 (in equity), is overruled and a jury trial refused. An exception is noted and bill sealed for respondents.